78 So.3d 753 (2011)
Mary Kathryn DAIGLE, Plaintiff-Appellee
v.
CITY OF SHREVEPORT, Defendant-Appellant.
Mary Kathryn Daigle, Plaintiff-Appellee
v.
City of Shreveport, Defendant-Appellant.
Nos. 46,429-CA, 46,492-CA.
Court of Appeal of Louisiana, Second Circuit.
October 5, 2011.
*758 S.P. Davis, for Appellant, City of Shreveport, # 46,429-CA.
S.P. Davis, Terri Anderson-Scott, Shreveport, LA, Andrew Lee Randall, Jr., for Appellant, S.P. Davis, # 46,492-CA.
Simmons, Morris & Carroll, Shreveport, LA, by B. Trey Morris, for Appellee, Mary Kathryn Daigle.
Before BROWN, WILLIAMS, CARAWAY, PEATROSS and LOLLEY, JJ.
LOLLEY, J.
The City of Shreveport ("the City") appeals the judgment by the First Judicial District Court, Parish of Caddo, State of Louisiana in favor of Mary Daigle in a personal injury case ("the personal injury case"). Additionally, S.P. Davis, the attorney for the City, in his personal capacity, appeals the judgment by the trial court *759 from a related hearing ordering him to pay sanctions ("the sanctions case"). For the following reasons, we amend the trial court's judgment on the personal injury case and, as amended, affirm. We also affirm the trial court's ruling on the sanctions case.

FACTS

The Personal Injury Case
On January 21, 2005, Daigle, an employee of the Caddo Parish District Attorney's Office, left her office at the Caddo Parish Courthouse in downtown Shreveport to meet some friends for lunch. Unbeknownst to her, the City had recently painted the curbs lining McNeil Street near where she exited and the curbs were still wet. When Daigle stepped onto the curb, the wet paint caused her to slip, fall, and injure herself. According to the City, the wet curbs were marked with cones stating "Wet Paint." Daigle maintains that the only cone placed in the vicinity at the time of the incident was located at the end of the block; she did not see it until after she fell.
In August 2005, Daigle filed suit against the City of Shreveport for the injuries she sustained as a result of the 2005 slip and fall. A bench trial was held and the trial court ruled in her favor, awarding her damages for past medical expenses in the amount of $10,815.70, future medical expenses in the amount of $452,686.00, loss of enjoyment of life in the amount of $200,000.00, pain and suffering in the amount of $400,000.00, as well as the costs of court. The City of Shreveport now appeals this judgment.

The Sanctions Case
At the time Daigle filed suit against the City, she was represented by attorneys Larrion Hillman and Kammi Whatley; the City was represented by attorney S.P. Davis; and, the matter was set before Judge Ramon Lafitte. Counsel for Daigle answered discovery in February 2006 and listed Judge Roy Brun as a witness to the event. On October 10, 2007, Daigle's counsel withdrew from representation and was replaced by current counsel, B. Trey Morris, who never listed Judge Brun as a witness throughout the remainder of the litigation. On May 5, 2009, Judge Lafitte recused himself from the case and the case was reassigned to Judge Brun. On June 11, 2009, Davis, the City's attorney, listed Judge Brun as a witness. At a status conference the attorneys and Judge Brun discussed the issue of whether or not Judge Brun was actually a witness to the event; Judge Brun stated he did not see the accident occur, he did not know anything about the accident, and he did not know if he would even recognize Mary Daigle if he saw her. He also stated that if the attorneys intended to recuse him, they should do it at that time. No motions to recuse were filed at that time. Trial was set for March 10, 2010, and neither party had Judge Brun listed as a witness on any current witness lists or the pretrial order. Judge Brun presided over the City's motion for summary judgment on March 15, 2010.
In March 2010, the City requested a continuance of the court date in order to obtain an Independent Medical Examination ("IME") of Daigle. The trial court granted the continuance and reset the trial for September 2, 2010. All expert reports were to be submitted by August 3, 2010. On August 2, 2010, the City amended its witness and exhibit list to include, once again, Judge Brun as well as Dr. Anil Nanda, the doctor sought by the City to give the IME of Daigle. On August 15, 2010, the City moved to continue the trial date once again because it was unable to secure an IME until after the September 2, 2010, trial date. After a hearing on the *760 matter, the trial court denied the motion to continue. The City then applied for supervisory writs to this court on the issue. The writs were denied; therefore, the trial was set to go forward as scheduled on September 2, 2010.
On the morning of trial the City filed a motion to recuse Judge Brun from presiding over the trial because he was listed as a witness on its witness list. Judge Frances Pitman conducted a hearing on the motion to recuse. After hearing testimony from Daigle, Davis, Whatley, and witnesses to the 2005 slip and fall, the trial court denied the motion to recuse and, on the court's own motion, set the matter for a hearing on sanctions against Davis.
After a hearing on the issue, the trial court imposed sanctions on Davis, finding that he was not in good faith when he filed the motion to recuse Judge Brun, but that he filed the motion in an effort to receive an extension of time. The trial court ordered him to pay Daigle's attorney fees for the hearing on the recusal as well as the hearing on the sanctions, a total of $3,000.00, in his personal capacity. Davis now appeals.

LAW AND DISCUSSION

The Personal Injury Case
On appeal, the City asserts four assignments of error regarding the personal injury case. An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless clearly wrong. This standard requires the appellate court to give great deference to credibility determinations made by the trier of fact. Rosell v. ESCO, 549 So.2d 840 (La. 1989). To reverse a trial court's factual determinations, a court of appeal must find, based on the record, that no reasonable factual basis exists and that the findings are clearly wrong or manifestly erroneous. Wimberly v. Giglio, 46,000 (La. App.2d Cir.01/26/11), 57 So.3d 389. In applying the manifest error/clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Therefore, we will examine the applicable assignments of error to determine whether the trial court was manifestly erroneous or clearly wrong.

1) Motion for Continuance
In its first assignment of error, the City asserts that the trial court erred in denying its Motion to Continue in order to conduct an IME on Daigle.[1] The City argues that in denying the additional continuance, the trial court violated La. C.C.P. art. 1602, mandating when a continuance shall be granted, for two reasons. First, the City claims it diligently attempted to have an IME completed during the first continuance in order to conduct full discovery on essential issues of the case, namely causation and the aggravation of Daigle's pre-existing injuries, but was unable to do. Second, the City claims Dr. Nanda is a material witness to the case and was unable to be present in court on the date on which trial was set. These two facts, the City asserts, mandated a continuance in accordance with La. C.C.P. art. 1602.
*761 Daigle filed suit against the City in August 2005. After almost five years of pretrial litigation and preparation, the trial was set for March 2010. Dr. Pierce Nunley, Daigle's treating physician, was deposed in February 2010. On March 4, 2010, the trial court authorized an IME. On March 15, 2010, a motion to continue the trial was granted and the new trial date was set for September 2, 2010, a continuance of nearly six months. The City claims it diligently attempted to have an IME performed by three different doctors during this continuance and was unable to do so through no fault of its own.
On August 16, 2010, Dr. Nunley was deposed again. This time, counsel for Daigle was in attendance; however, counsel for the City was not. This same day the City filed another motion to continue on the grounds that the City was not able to secure an IME until September 14, 2010, after the trial date set for the matter. The City requested the trial date be pushed back until October 18, 2010, in order to accommodate the IME. In an effort to make sure the City would be ready to proceed with trial on this new October date if a continuance was granted, the trial court asked the City to confirm the September IME with Dr. Nanda, the defense's physician of choice. In so doing, the City discovered that the September date was no longer available with Dr. Nanda, and October 8, 2010, was the soonest available opening. After reviewing its docket, the trial court discovered that if the trial was continued to accommodate the IME in October, the trial date would have to be pushed back to December 2010.
Although the trial court noted it routinely grants IMEs, "in the interest of justice" it denied the motion to continue at issue and articulated several reasons for this decision. First, the trial court identified that this case was five years old and the City had already been given a nearly six-month continuance in order to secure an IME, and failed to do so. Additionally, the trial court articulated that, from experience, the doctor sought to give the IME, Dr. Nanda, was notoriously difficult to schedule to come into court. And most importantly, the trial court explained that Dr. Nunley, Daigle's treating physician who handled her injuries both before and after the 2005 slip and fall, had been deposed and could give his opinion on Daigle's injuries. The trial court identified that Dr. Nunley was not a doctor who was known for testifying in court, he had practiced for a long time, and was not a "plaintiff doctor" or a "defense doctor."
The issue of whether the trial court erred in denying the Motion to Continue is a hybrid of two issues: the authorization to order an IME of the plaintiff and the continuance. Although the trial court had previously authorized an IME of Daigle, the authorization was essentially rescinded on the grounds that the IME was no longer justified in light of the trial continuance necessary to facilitate it.
Louisiana C.C.P. art. 1464 governs the law on IMEs. In pertinent part, it states:
When the mental or physical condition of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control, except as provided by law... The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties ...
In accordance with this article, the party moving for an IME must demonstrate the following: (1) that the physical or mental *762 condition of the party sought to be examined is in controversy and (2) that good cause exists for requiring the party to submit to the examination. Leaf v. Leaf, 2001-1417 (La.App. 4th Cir.08/15/01), 796 So.2d 42. The trial court has wide discretion in determining whether an IME should be ordered. Id. The decision should be based upon the individual facts and circumstances of each case. Id.
Here, Daigle has placed her physical condition "in controversy" by filing suit against the City. Thus, the first requirement for the grant of an IME is satisfied. The second requirement, whether "good cause" exists for ordering the plaintiff to submit to an IME, is at issue. It is important to note that the ability of the movant to obtain the desired information by other means is relevant in deciding whether good cause was shown for ordering an IME. Williams v. Smith, 576 So.2d 448 (La.1991). Here, Daigle's treating physician, Dr. Nunley, was available for deposition about all of Daigle's medical issues. He was not known by the trial court to be a "plaintiff doctor" or a "defense doctor" and had more experience with Daigle than any doctor could after having examined her only once or twice. The general rule is that the testimony of a treating physician should be afforded greater weight than that of a physician who examines a patient only once or twice. Dunlap v. Madison Parish School Bd., 46,139 (La.App.2d Cir.04/13/11), 61 So.3d 833. Therefore, the trial court did not err in finding that the City did not meet the second element in proving that good cause existed for ordering an IME.
Another part of this issue is whether the trial court erred in denying the motion for continuance. Louisiana C.C.P. art. 1601 on continuances is discretionary and provides, "A continuance may be granted in any case if there is good ground therefor." Additionally, La. C.C.P. art. 1602 governs instances when a continuance is mandatory. It provides:
A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.
Here, the trial court did not err under either article.
Under art. 1601, the trial court did not find that good ground existed for a continuance in light of the length of time the trial had been before the court, the six-month continuance that had recently been granted, and the availability of Daigle's treating physician to testify regarding the same issue.
Nor did the trial court err in denying the motion for continuance under art. 1602. In light of the six-month continuance that had expired without an IME having been done, the City did not show it had put forth the requisite "due diligence" mandated by art. 1602 to have the IME performed. Also, the "evidence material to his case" could have been obtained through other methods, namely through Dr. Nunley. Article 1602 also requires a continuance when "a material witness has absented himself without the contrivance of the party applying for the continuance." Here, the City argues Dr. Nanda is a material witness and because he has absented himself, the trial court erred in not granting a mandatory continuance to allow him to conduct an IME. However, we find that Dr. Nanda is not a "material witness." In order for a witness to be deemed material, it must be shown that the witness is essential to that party's presentation of the case. Moore v. Wilson, 34,135 (La.App.2d *763 Cir.11/03/00), 772 So.2d 373, 378. Dr. Nanda's role as an expert witness was to examine Daigle and give his medical opinion as to her injuries and the need for surgery. This same information was already given by Dr. Nunley who was available for the City to question in deposition. Also, Dr. Nunley's opinion warranted greater weight than Dr. Nanda's, if given, because Dr. Nunley treated Daigle both before and after the fall and was familiar with her. Thus, we find no error in the trial court's ruling to deny the motion to continue on these grounds.
Additionally, trial courts are vested with great discretion in determining the manner in which they handle their dockets. Appellate courts interfere in trial court matters such as control of a docket, case management, and determination of whether a continuance should be granted, only with reluctance and in extreme cases. Thinkstream, Inc. v. Rubin, 2006-1595 (La.App. 1st Cir.09/26/07), 971 So.2d 1092, 1102, writ denied, 2007-2113 (La.01/07/08), 973 So.2d 730. The trial court here had the right to deny the motion to continue that, if granted, would set the trial date back an additional four months. Considering the facts of this particular case, we cannot conclude that the trial court abused its discretion in going forward with trial and denying the City's motion to continue.

2) Motion to Recuse
In its second assignment of error the City contends the trial court erred in denying its motion to recuse Judge Brun.[2] The City argues that because he was a witness in the case, as a matter of law Judge Brun should have been recused. This recusal, the City claims, was mandatory under La. C.C.P. art. 151 and not within the discretion of the trial court to deny.
The tantamount duty of a judge is to conduct fair and impartial proceedings. In re Cooks, 1996-1447 (La.05/20/1997), 694 So.2d 892. It is well settled that a trial judge is presumed to be impartial. State v. Edwards, 420 So.2d 663 (La.1982). Louisiana C.C.P. art. 151(A) sets forth the grounds for which a judge shall be recused, and in pertinent part, states: "A judge of any court, trial or appellate, shall be recused when he: (1) is a witness in the case ..." Louisiana C.C.P. art. 154 explains the procedure for recusal, and provides, in pertinent part:
A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter ... If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or a judge ad hoc, as provided in Articles 155 and 156, for a hearing.
In the case sub judice, Judge Brun was initially listed as a witness by Daigle's first attorneys in a document signed on February 21, 2006. On two separate occasions, Judge Brun spoke to the attorneys representing both sides in the case and stated he had no knowledge of the 2005 slip and fall and was not, in fact, a witness. It was not until less than a month before the September 2010 trial was set to begin that the City listed Judge Brun again as a witness, despite the Judge's contentions *764 that he was not. It was not until the morning of trial that the City filed a Motion to Recuse Judge Brun, although the issue of Judge Brun having been placed on a witness list had first occurred and been handled years prior. The trial court, in accordance with La. C.C.P. art. 154, set the matter for a hearing.
Judge Frances Pitman presided over the hearing, and heard the testimony of several people. Daigle testified that she "personally did not give Judge Roy Brun's name" as a witness to the event. She also stated, "I would have had no reason to give his name as a witness because I did not see him." Judge Brun also testified. He stated, "I have not seen anybody, female or male, fall down outside the court house or outside, or you know, on the court house grounds." Kammi Whatley, one of Daigle's first attorneys who represented her when Judge Brun was originally listed as a witness also testified at the hearing, but invoked the attorney-client privilege and did not give any insight into how Judge Brun's name ended up on the witness list. Joyce Brown and Gailynn Dennis were both at the scene of the 2005 slip and fall and testified that they did not see Judge Brun at the scene. S.P. Davis, the City's attorney, also testified. He stated that Whatley told him in a phone conversation that Daigle identified Judge Brun as a witness and that was why he was included on the witness list. Not one person testified that Judge Brun actually witnessed the event take place or had any valuable information to add at trial if called as a witness. After hearing the testimony, the trial court denied the motion to recuse, finding Daigle and Judge Brun to have been very credible. The trial court further explained its rationale for the ruling:
I listened to Judge Brun, he doesn't know anything about Ms. Daigle's case; he didn't see Ms. Daigle. He didn't know anything about it. I've listened to everybody else who was around there, none of them know anything about this or saw Judge Brun there. Judge Brunif you want to call him as a witness in this case I believe that is very you are not in good faith if you try to do it. I think what you're trying to do is get Judge Brun recused because he's ruled against you and I don't think that's the way you're supposed to practice law.
Here, we find the trial court did not err in denying the City's motion to recuse Judge Brun. The trial court followed the proper procedures in setting a hearing for the motion, and the City was allowed to present any relevant witnesses. The trial court clearly weighed all the testimony, finding both Judge Brun and Daigle to be credible, and denied the motion. In light of the testimony, this judgment was certainly a reasonable one. Although Judge Brun was listed at one time on a witness list, that took place years prior to the filing of the City's motion, which was not filed until the day of trial. Additionally, at the hearing even Davis admitted he believed that Judge Brun had not witnessed the slip and fall. The City fails to recognize the distinction between someone having been listed as a witness, and someone actually having witnessed an event. Although Judge Brun had been listed as a witness at one time, it was clear to everyone involved that he was actually not a witness at all. Thus, the trial court did not err in denying the motion to recuse him.

3) Liability
In its third assignment of error, the City asserts the trial court erred in finding it liable for Daigle's injuries from the 2005 slip and fall. It asserts that Daigle did not meet her burden of proof, because she did not present any witnesses *765 who testified that the wet paint was the cause of the slip and fall. Additionally, the City claims it should not be held responsible for every defect in the sidewalk. Daigle contends that she did meet her burden of proof in showing that the City violated its own policies regarding warning of wet paint. Additionally, she points out that the City did not meet its burden of proof in showing comparative fault.
When an individual is injured as a result of an unreasonably dangerous condition existing on a landowner's property, he can recover damages relying on La. C.C. art. 2315 which is the basis of general negligence liability. The owner or person having custody of immovable property has a duty to keep the property in a reasonably safe condition and must discover any unreasonably dangerous condition on the premises and either correct that condition or warn potential victims of its existence. Ebarb v. Guinn Bros., Inc., 29,179 (La. App.2d Cir.02/26/97), 691 So.2d 228, writ denied, 1997-1120 (La.06/13/97), 695 So.2d 981. This duty to warn is at the crux of the case sub judice; thus, Louisiana's duty-risk analysis is implicated. This analysis centers around five elements: 1) proof that the defendant has a duty to conform his conduct to a specific standard (the duty element); 2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); 3) proof that the substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); 4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, 5) proof of actual damages (the damages element). Allums v. Parish of Lincoln, 44,304 (La.App.2d Cir.06/10/09), 15 So.3d 1117.
Proof of liability on the part of a public entity, such as the City, is governed by La. C.C. art. 2317, as modified by La. R.S. 9:2800. Louisiana C.C. art. 2317 provides in pertinent part, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody[.]" Louisiana R.S. 9:2800(B) provides in pertinent part,
... [N]o person shall have a cause of action based solely upon the liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
The City has a duty to maintain its streets in a safe condition for use by the public. Patrick v. State Farm Mut. Auto. Ins. Co., 42,197 (La.App.2d Cir.05/16/07), 957 So.2d 894, writ denied, 2007-1452 (La. 10/12/07), 965 So.2d 400. To determine whether the defect complained of presented an unreasonable risk of harm, courts balance several factors including the probability and gravity of the harm presented by the risk against the social utility of the thing involved. Durkee v. City of Shreveport, 587 So.2d 722, 726 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991). In each case, of course, the unreasonable character of the defect must be decided on the particular facts and circumstances presented. McDade v. Town of Oak Grove, 545 So.2d 1276, 1278 (La.App. 2d Cir. 1989). The determination of whether a defect presents an unreasonable risk of harm involves factual findings which differ in each case. Thus, there is no fixed or mechanical rule for determining whether a defect presents *766 an unreasonable risk of harm. Buchignani v. Lafayette Ins. Co., 41,384 (La.App.2d Cir.08/23/06), 938 So.2d 1198. The trier of fact determines whether a defect presents an unreasonable risk of harm and that determination is reviewed under the manifest error standard. Id. The vice or defect must present a dangerous condition that would be reasonably expected to cause injury to a prudent person exercising reasonable care under the circumstances. Williams v. City of Baton Rouge, 2002-0682 (La.App. 1st Cir.03/28/03), 844 So.2d 360.
In Woods v. State ex rel. Department of Transp. and Development, 37,185 (La. App.2d Cir.08/14/03), 852 So.2d 1109, this court explained that the Department of Transportation and Development must warn of any dangerous or potentially dangerous conditions in a construction zone and that this warning must be sufficient to alert an ordinary, reasonable motorist, having in view the probable traffic, the character of the road and the reasonably anticipated use. Whether the warnings are reasonable and adequate depends on location of the danger, the nature of the road and the general situation and circumstances. The same principle holds true for the City when performing work on a curb where pedestrians walk. The City must warn of a dangerous condition and this warning must be sufficient to alert an ordinary pedestrian, considering all the circumstances.
In the case sub judice, it is uncontested that the City was painting the curbs lining McNeil Street downtown on the day when the 2005 slip and fall occurred. The issue at the heart of this case is whether the City took the proper precautions and adequately warned pedestrians, including Daigle, of the danger of those wet curbs.
Daigle called several witnesses at trial. Gailynn Davis testified that she saw Daigle sitting on the curb after her fall. She testified that there was a cone on the street, but the cone was far down the block near a pedestrian crosswalk. Gailynn moved a cone from down the block to the spot where Daigle had fallen because she identified the wet paint as a potential problem for others. The spot where Daigle had fallen was near the exit of the courthouse and Gailynn noticed footprints where it appeared that others had walked through the paint, as well.
Joyce Brown also testified at trial. She explained that she had lunch plans with Daigle the day of the incident. Joyce testified that she first saw Daigle being helped back into the building after she had fallen. Joyce also testified that she and a coworker went outside to the scene of incident after Daigle returned indoors and saw smeared paint. She testified she did not see any cones or signs at the area.
Kemone Howard worked for the City and was a member of the crew that painted the curbs downtown that day. He testified that while he did not remember much about that specific day, he did remember having to come back and grind painted footprints out of the sidewalk because people had walked through the paint and tracked it onto the sidewalk. He also testified that the City employed a specific procedure of placing cones when painting a curb.
Mike Boswell, Supervisor of Traffic Engineering for the City, also testified. He stated that he arrived downtown at 12:15 p.m. that day, and when he arrived there were no cones placed because the paint was already dry. Painting the curbs was the last action reported before the crew went to lunch. He also confirmed that three days after the day of Daigle's fall the crew went back and grinded paint tracks out of the street where people had walked through the wet paint.
*767 Bobby Ezernack testified by deposition. He was a traffic engineer with the City in 2005 and admitted he did not remember full details of the day in question; however, he did remember painting the curbs downtown. He testified that he did not specifically remember if the crew placed cones that day, but that they usually did. He read from a report of the day that before lunch the crew painted the curbs at McNeil Street. The City's report continued that the crew met with a supervisor for risk management. This, Ezernack explained, signified that "something happened." He also remembered coming back to grind paint off the sidewalk where people had stepped on the curb and tracked it. He remembered there having been a lot of footprints. However, he also stated that it was very common for people to cross the cones the paint crew set up and walk through paint.
Daigle also testified at trial. She explained that on the day of the incident she had lunch plans, so she left the courthouse where she worked to get the car. She was alone at this time and it was not raining. She testified that she stepped onto the curb and her left foot slipped on what "felt like an icy patch." She stated that she later realized there was one cone at the end of the block near a crosswalk, but where she fell, in the middle of the block, there were no cones. She explained how Dennis walked up to her and found her on the ground and that she asked her to bring the cone from down the block to the spot where she had fallen so others would not also fall. She explained that she was helped into the building and an ambulance was called. She stated that there was paint everywhere and those helping her had to put plastic bags and paper towels down so she could sit. She described the paint as "wet and thick."
The City called Kelly Patterson-Skeesick to testify. Patterson-Skeesick was a private insurance investigator called to investigate the incident. Although she could not recollect much and did not have a report to reference, she stated that when she arrived at the scene there were cones placed every three to four to five feet, and that it was obvious that the area was one to be avoided. However, she could not remember what time it was when she arrived and saw these cones. Additionally, Patterson-Skeesick noted that her report and pictures from the scene that day were not accessible to her because she no longer worked for the company by which she was previously employed.
Here, it is apparent that the City owed a duty to warn pedestrians of the dangerous condition created from painting the curbs. What is at issue is whether or not the City breached this duty by failing to adequately warn pedestrians of the danger it created and whether the paint was the cause in fact of Daigle's fall. After examining the testimony adduced at trial, we find the trial court committed no manifest error in finding the City liable for Daigle's injuries. Howard and Ezernack, members of the paint crew that day, admitted that they did not remember the details of what occurred. While they both testified that the normal protocol was to place cones to warn of the wet paint, neither could definitively state that on the date of the incident cones were placed. Boswell, another member of the crew, state there were no cones placed at 12:15 p.m. that day because the paint was dry. However, the paint was obviously not dry because when Daigle slipped, her clothes became covered in paint. Patterson-Skeesick was the only person who testified that there were cones placed at the accident site, and she could not recollect at what time she saw the cones on the site. One can deduce that she did not arrive on the scene until after *768 the slip and fall occurred because as an insurance investigator she would not have been called to the scene until after an accident occurred. The cones could have been placed after Daigle slipped and fell, once the crew was alerted to the danger, in order to prevent more injuries from occurring. Additionally, none of the witnesses testified that any other forms of warning were employed by the City that day. Therefore, the testimony of the members of the paint crew as well as Patterson-Skeesick does not show that the City adequately warned of the danger that day. Additionally, Daigle, as well as Gailynn and Joyce, all testified there were no cones or any other form of a warning at the area where Daigle fell at the time of the slip and fall. Davis also testified, without any evidence presented to the contrary, that the paint caused her to fall. Dr. Nunley also testified that Daigle was injured due to the 2005 slip and fall. The trial court obviously found Daigle, Davis, Brown, and Dr. Nunley to have been credible witnesses. Accordingly, the trial court did not err in finding the City failed to adequately warn of the danger it created from painting the curbs and that the wet paint was the cause-in-fact of Daigle's fall; furthermore, trial court also did not err in finding the City liable for Daigle's injuries.
Finally, in assessing the comparative fault of parties, various factors may influence the degree of fault assigned. These include whether the conduct resulted from inadvertence or involved an awareness of danger, how great a risk was created by the conduct, the significance of what was sought by the conduct, the superior or inferior capacity of the parties, and any extenuating circumstances which might require one to proceed in haste and without proper thought. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985); Buchignani v. Lafayette Insurance Co., supra. The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong or manifestly erroneous. Hughes v. Scottsdale Ins. Co., 35,043 (La. App.2d Cir.08/22/01), 793 So.2d 537. A pedestrian has a duty to see what should be seen and is bound to observe whether the pathway is clear. Hutchinson v. Knights of Columbus, Council No. 5747, 2003-1533 (La.02/20/04), 866 So.2d 228; Moore v. Oak Meadows Apartments, 43,620 (La.App.2d Cir. 10/22/08), 997 So.2d 594. However, pedestrians are not required to scrutinize the pavement for irregularities. Williams v. Ruben Residential Properties, LLC, 46,040 (La.App.2d Cir.03/02/11), 58 So.3d 534. Moreover, it is reasonable for a pedestrian to react to traffic conditions by looking at vehicles instead of at the pavement. Bessard v. State, Dept. of Transp. and Development, 1994-0589 (La.11/30/94), 645 So.2d 1134.
Here, the record reflects no evidence of Daigle's comparative fault for the injuries. Considering that, as well as the applicable jurisprudence, the trial court did not err in its conclusion that the City was fully liable for Daigle's injuries.

4) Damages
In its fourth assignment of error, the City asserts the trial court abused its discretion in its award of general and special damages to Daigle. It claims the award of general damages is too high in light of Daigle's age, pre-existing injuries, and subsequent falls after the 2005 slip and fall. It also calls into question the basis for the award of future medical expenses. Daigle claims the award of damages was proper because of all the pain and suffering she has had to endure and will continue to endure. Additionally, she points out that the testimony regarding *769 the cost of future medical expenses was left unrebutted by the City.
The trial court awarded Daigle $463,501.70 in special damages: $10,815.70 for past medical expenses and $452,686.00 for future medical expenses. The trial court also awarded Daigle $600,000.00 in general damages: $200,000.00 in loss of enjoyment of life and $400,000.00 in pain and suffering. The total amount awarded was $1,063,501.70.
Daigle testified that prior to this fall she had a history of neck and back pain. She underwent a discectomy in 1985 after experiencing pain in her back and legs. The surgery was successful in alleviating her pain until 1998 when she again began having periodic pain. In 2000, she was in an automobile accident and began experiencing pain again. This time it was in her neck, arms, back, and legs. In 2001, Dr. Nunley performed surgeries on her neck and back that proved partially successful in relieving the pain. In 2004, she began seeing a pain management doctor, Dr. Kathleen Majors, to help her manage the periodic pain she was experiencing in her lower back, legs, and neck; she was prescribed pain medication to take as needed.
Daigle described that after the 2005 slip and fall she was first taken to the emergency room. She then had an appointment with her family physician, Dr. Bruce Brouillette, followed by an appointment with Dr. Majors. She underwent a nerve block procedure, but it was not helpful in alleviating her pain. She then began wearing a back brace as well as a Transcutaneous Electrical Nerve Stimulation Unit ("Tens Unit") to help alleviate her pain. She testified that her pain was especially severe when sitting for long periods of time as was required for work. She described the pain she experienced before the 2005 slip and fall as "periodic." During this periodic pain, she would take pain medication as needed. However, after the 2005 slip and fall, she described the pain as nonstop, requiring her to take the full dose of her pain medication all the time. She also testified to the changes she experienced in her life as a result of the pain from the 2005 slip and fall. She stated she could not: sit for long periods of time so she was not able to enjoy dinners and movies with friends; do yard work or clean her home; lift anything heavy or reach for things off shelves, thereby further limiting her independence; sleep at friends' or family members' homes because she moans and groans from the pain in her sleep; walk far or use stairs and she has even fallen due to the pain. Her relationship with her grandchildren has changed as a result of the incident, as well. She testified that she desired the surgery because the pain was so bad, but she could not afford it and worried that she would have to take too much time off work to recover when she had it. She described the pain as consuming her life.
Dr. Nunley, Daigle's surgeon both before and after the 2005 slip and fall, was deposed prior to trial. He explained that the first time he met Daigle she had been involved in a motor vehicle accident that resulted in neck and back injuries. He performed two surgeries on her at that time. Dr. Nunley stopped seeing Daigle after having successfully treated her for those injuries and did not see her again until 2008. At this point the 2005 slip and fall had already occurred, and Daigle had sought more conservative forms of treatment first. But since she was getting no relief from the pain, she went back to Dr. Nunley to explore her surgical options. Dr. Nunley recounted that from January through April 2005 Daigle's medical documents from the emergency medical services, Willis Knighton Emergency Room, Dr. Brouillette, and Pain Care Consultants *770 all reported the same thingthat Daigle had slipped and fallen on wet paint and hurt her back. Her pain scale was documented in these records as a "ten." In February 2010, Dr. Nunley performed an MRI that showed the reasons for her pain: irritation of the nerves, broad based disc bulge, mild degenerative disc disease, and central disc herniation at L3-4 with ligamental flavum hypertrophy and fairly significant stenosis. Dr. Nunley offered to do more nerve root block procedures on her, but noted that with the level of stenosis she had she was probably going to need surgery. In March 2010, Dr. Nunley told Daigle that she had two options: she could live with the pain or she could have surgery. She would need an anterior cervical discectomy and fusion at C4-5 on her cervical spine (neck), and on her lumbar spine (lower back) she would need a minimal access 360 degree fusion at L2-3 and L3-4. Dr. Nunley stated Daigle reported she would like to have the surgeries done in one year or so, after she retired. Shari Alden, the Business Office Supervisor at Specialist Hospital in Shreveport, testified as to the estimated cost for the performance of these two surgeries, which totaled $452,686.00.
Dr. Nunley testified he found Daigle to be consistent in her description of aggravation of her pain since the 2005 slip and fall, and also stated that Daigle's pain as well as the subsequent need for surgeries is consistent with the slip and fall Daigle experienced. He found that Daigle had been reliable and consistent in her descriptions of the pain throughout the time he treated her. He also reported that Daigle will first have the lumbar surgery, followed by several weeks of healing, then the cervical surgery, followed by physical therapy. While the surgeries should help, Dr. Nunley opined that Daigle will have limitations after the surgeries and may still have some pain.
The plaintiff bears the burden of proving special damages by a preponderance of the evidence. In meeting her burden of proof on the issue of future medical expenses, the plaintiff must show that, more probably than not, these expenses will be incurred and must present medical testimony that they are indicated and the probable cost of these expenses. An appellate court reviews an award of special damages pursuant to the manifest error standard of review. Cormier v. Colston, 2005-0507 (La.App. 3d Cir.12/30/05), 918 So.2d 541, 547-48.
General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty. Duncan v. Kansas City Southern Railway Co., 2000-0066 (La.10/30/00), 773 So.2d 670. The standard of review for an award of general damages is abuse of discretion. Guillory v. Lee, 2009-0075 (La.06/26/09), 16 So.3d 1104. The trial court is afforded much discretion in fixing general damages because of its superior position to evaluate the witnesses' credibility and see the evidence firsthand. Id. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award but to review the exercise of discretion of the trial court. Id. Only if a review of the facts reveals an abuse of discretion should the appellate court resort to a review of prior, similar awards. Id. When this occurs the appellate court may only adjust the award by raising it to the lowest or lowering it to the highest within the trial court's discretion. Id.; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Here, we find the trial court's award of damages to be reasonable. The money awarded for Daigle's past medical expenses is accurate considering the amount of doctor's visits and medications *771 for which she has had to pay since the 2005 slip and fall. The amount awarded in future medical expenses is precisely the amount Alden testified was the estimated of the cost of the two surgeries recommended by Dr. Nunley. This figure was left unrebutted, and, thus, is reasonable. Daigle's awards for loss of enjoyment of life as well as pain and suffering are admittedly high. However, it is important to note that Daigle's life has drastically changed since the 2005 slip and fall. She can no longer enjoy many of the things she once did, including time with her grandchildren, other family members, and friends. She also lives in constant pain, and even after the surgeries, will likely continue to have some pain and physical limitations.
However, we must observe the existence of certain Louisiana statutes that bear on the awards in this case. Louisiana R.S. 13:5106(B)(1) places a cap of $500,000.00 on general damages in a personal injury case against the state and its political subdivisions, including a city. The City does not waive its right to invoke the cap if it did not specifically plead reliance on it as a limitation on its liability. See Mitchell v. State through Dept. of Transp. and Development, 596 So.2d 353 (La.App. 3d Cir.1992). Additionally, if future medical expenses are awarded, La. R.S. 13:5106 B(3)(a) provides that the trial court must establish a reversionary trust for the benefit of the claimant, out of which all future medical expenses are to be paid. The statute also regulates the procedure for such a trust. In addition, La. R.S. 13:5112(A) requires the trial court to specify a dollar amount of court costs when awarded against the state or political subdivisions.
Thus, we must remand this matter to the trial court for compliance with the provisions of La. R.S. 13:5106(B)(1) and (3)(a) for the imposition of the $500,000.00 cap on general damages and the establishment of a reversionary trust, and for compliance with La. R.S. 13:5112, relative to fixing the amount of court costs assessed against the City.

The Sanctions Case
As explained herein, Judge Pitman presided over the sanction hearing. At the hearing, the trial court sanctioned the City's attorney, Davis, in connection with his filing of the motion to recuse, which the trial court considered was merely done as a dilatory tactic. Davis asserts one assignment of error as to that judgment against him personally, and claims the imposition of sanctions was improper because the City's request for a continuance was unrelated to the motion to recuse and the motion to recuse was procedurally proper. He also asserts that if the sanctions are upheld, the trial court erred in ordering him to pay them in his personal capacity as opposed to imposing them against his client, the City. He notes that he was told by his superior to file the motion to recuse. We disagree.
Louisiana C.C.P. art. 863 governs the imposition of sanctions and provides, in pertinent part (with emphasis added):
A. Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address.
B. Pleadings need not be verified or accompanied by affidavit or certificate, except as otherwise provided by law, but the signature of an attorney or party shall constitute a certification by him that he has read the pleading, and that to the best of his knowledge, information, and belief formed after reasonable inquiry, he certifies all of the following:

*772 (1) The pleading is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.
(2) Each claim, defense, or other legal assertion in the pleading is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law.
(3) Each allegation or other factual assertion in the pleading has evidentiary support or, for a specifically identified allegation or factual assertion, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
....
D. If, upon motion of any party or upon its own motion, the court determines that a certification has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party the amount of the reasonable expenses incurred because of the filing of the pleading, including reasonable attorney fees.

E. A sanction authorized in Paragraph D shall be imposed only after a hearing at which any party or his counsel may present any evidence or argument relevant to the issue of imposition of the sanction.
Article 863 does not allow the court to impose sanctions on a lawyer simply because a particular argument or ground for relief contained in a non-frivolous pleading was found to be unjustified. Duggan v. Bossier Federal Credit Union, 39,176 (La.App.2d Cir.01/26/05), 892 So.2d 169. The standard of review is whether the district court abused its discretion in assessing sanctions. Id.
To decide whether sanctions are appropriate, a court must consider these factors in determining whether a litigant and his counsel made the required reasonable factual inquiry as is required by La. C.C.P. art. 863: (1) time available to the signor or investigator; (2) extent of the attorney's reliance on the client for factual support for pleadings; (3) feasibility of prefiling investigation; (4) whether the signing attorney accepted the case from another attorney; (5) complexity of factual and legal issues; (6) the extent to which development of factual circumstances underlying the claim required discovery. Alombro v. Alfortish, 2002-1081 (La.App. 5th Cir.04/29/03), 845 So.2d 1162, writ denied, 2003-1946 (La.10/31/03), 857 So.2d 485.
Once it is determined that sanctions are appropriate, the trial court has "considerable discretion as to the type and severity of sanctions to be imposed," and we review those decisions under the abuse of discretion standard of review. Joyner v. Wear, 27,631 (La.App.2d Cir.12/06/95), 665 So.2d 634, 642, writ denied, 1996-0040, 1996-0042 (La.02/28/96), 668 So.2d 370. Four factors have evolved which must be considered in arriving at an appropriate sanction award. They are: (1) the conduct being punished or sought to be deterred by this sanction; (2) the expenses or costs caused by the violation of the rule; (3) whether the costs or expenses are "reasonable" as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention; and, (4) whether the sanction is the least severe sanction adequate to achieve the purpose of the rule under which it was imposed. Alombro v. Alfortish, supra.
Additionally, art. 863 requires an attorney to sign a document in his "individual name." Sanctions may be imposed on the person who made the certification. A personal, nondelegable duty is imposed *773 on the signing attorney to satisfy himself, by application of his own judgment, that the pleading is factually and legally responsible. Because the duty belongs to the individual attorney, only he, and not his law firm, may be sanctioned for violating the duty. Murphy v. Boeing Petroleum Services, Inc., 600 So.2d 823, 827 (La.App. 3d Cir.1992).
As evidenced by its reasons for judgment, the trial court considered Davis' behavior when coming to its judgment. It stated:
Now, I'm not a poker player and I'm not a card player but I remember when you used to play some of these children games and you had an ace and you would hide it from your opponent, you kind of keepkind of palm it and keep it in your hand and you wait until they do something and you say, "Here's my trump card." I think that's what y'all have done, Mr. Davis. I think y'all have added in Judge Brun and waited until something was going to happen that wasn't what you wanted like going to the Appeals Court and getting a contrary ruling from what you wanted and I think that y'all decided yesterday at 5:00 to file this motion to recuse and I think it's not the way you're supposed to practice law. I think you filed it and you knew good and well that Judge Brun has been ruling on things and it was just fine as long as he was ruling on things until you all of a sudden had to go to trial. And now that you have to go to trial all the sudden he's supposed to be recused.
Under La. C.C.P. art. 863 as an officer of the court, Davis had a duty to conduct a reasonable inquiry into the issue of his pleadings before filing them. Here, Davis did perform such inquiry and knew his filing of a motion to recuse Judge Brun was not based on facts. He admitted that he knew Judge Brun, if called to testify at trial, would state that he did not witness the slip and fall and had no information to aid in the trial. Because Davis knew this and continued with his motion to recuse, he was not in good faith. He failed to perform his duties as an officer of the court. The trial court clearly considered all of the facts connected to and leading up to Davis' 11th hour motion to recuse. The trial court did not err in imposing sanctions on Davis. Moreover, the sanctions were properly imposed on Davis in his personal capacity and not the City. His position as attorney for the City is akin to being a part of a law firm, and fault for his actions will not lie with his superior at the City.

CONCLUSION
Considering the foregoing, we affirm the judgment, as discussed, and remand to the trial court for the imposition of the $500,000.00 cap on general damages and the establishment of a reversionary trust, and for compliance with La. R.S. 13:5112, relative to fixing the amount of court costs assessed against the City. Costs of this appeal are assessed to the City of Shreveport, pursuant to La. R.S. 13:5112, in the amount of $146.50. Costs of his separate appeal are assessed to S.P. Davis.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
WILLIAMS, J., concurs with written reasons.
CARAWAY, J., dissents with written reasons.
WILLIAMS, J., concurs.
I must respectfully concur with the majority's well-written opinion, because I cannot agree with the procedure used by this court in consolidating these two appeals following their submission to the court for decision.
*774 Initially, these cases were separately docketed in the normal course and randomly assigned to different three-judge panels, with one judge who was sitting on both panels. Daigle, 46,429, was submitted to the court for decision on June 20, 2011, without argument. Daigle, 46,492, was submitted for decision following oral argument on June 21, 2011.
However, following submission, this court consolidated the two appeals on its own motion, noting the common issue of recusal.
Upon consolidation after the cases were submitted for decision, I believe this court was obligated to hear these appeals en banc.
CARAWAY, J., dissenting.
If the trial court's denial of the City's continuance for trial involved only the City's delinquency in failing to obtain an independent medical examination during the months before trial, I could agree with the majority and affirm the denial of the continuance. Yet, the City argued something else to the trial court which can now be seen as having upset the fundamental fairness of this trial. The City has consistently argued that the necessity for a continuance was caused by the late determination by Dr. Nunley of the drastic plan of surgeries to be performed on the plaintiff involving multiple fusions of her spine. The plaintiff's August 2010 election for the surgeries, the description of what the surgeries entailed, and the $452,686 cost for surgeries were only first revealed during the last 30 days before trial in violation of the trial court's scheduling order preventing discovery.
Prior to August 2010, the plaintiff had announced herself ready for trial in early 2010 with a case for her damages which was entirely different from the case ultimately tried. At the time of the initial pretrial order which set a March 23, 2010 trial date, plaintiff had apparently not considered or elected back surgery throughout the five years following this accident. From August until October 2008, 3-1/2 years after the accident, plaintiff returned to visit Dr. Nunley, who had previously performed two fusion surgeries on her spine in 2000-2001. Dr. Nunley's "trial" deposition, as identified on the pretrial order, was taken on February 11, 2010 (the "First Deposition"). Dr. Nunley presented his conclusion that plaintiff's ongoing pain involved the L 3-4 central disc herniation and its associated degenerative disc disease. He discussed possible injection treatments or probable "eventual" surgery. He said "there's a possibility it could be a laminectomy but there's also a possibility it could be a fusion." Critically, Dr. Nunley reported in his First Deposition that the plaintiff had been presented those treatment options for her L 3-4 injury in October 2008 and had never returned to Dr. Nunley for further treatment. Thus, on the report of the First Deposition, had trial occurred as scheduled in March 2010, plaintiff's claims for any future medical treatment was highly speculative in that she had never elected surgical treatment for over five years. Moreover, any future surgery as identified by Dr. Nunley in his First Deposition was for "a fusion," a single surgery, limited to L 3-4.
After the March trial setting was continued, the trial court fixed trial for September 2, 2010, by its Scheduling Order of April 7, 2010. The order provided as follows:

B. Discovery requests must be made before FORTY-FIVE (45) DAYS BEFORE DATE OF TRIAL and all discovery is to be completed THIRTY (30) DAYS BEFORE DATE OF TRIAL.
*775 Despite the above scheduling order, plaintiff served notice on July 20 of the second deposition for Dr. Nunley to be taken on August 16, 2010 (the "Second Deposition"), within 30 days of trial. The record does not show that the City agreed to the taking of this deposition which was a violation of the Scheduling Order. Counsel for the City did not attend. The later use of the deposition for evidence under those circumstances was not in compliance with La. C.C.P. art. 1450. See, Boneno v. Lasseigne, 514 So.2d 276 (La.App. 5th Cir. 1987). On August 2, prior to the deposition, the City notified plaintiff that it had been unable to obtain a date for the IME before the September 2 trial date. The City asked for a continuance. On August 9, plaintiff's counsel refused a voluntary continuance, and plaintiff contested the continuance which the City then formally sought from the trial court. Thus, when these exchanges between the parties are fairly reviewed, the City's assessment of plaintiff's medical condition was not made timely before the September 2 trial date. Nevertheless, the plaintiff's revelation and expansion of her medical damage claims for multiple fusion surgeries were also made untimely in violation of the trial court's Scheduling Order.
The contrast between the First Deposition and the Second Deposition is striking. One week before the August 16 deposition and over five years after the accident, the 69-year-old plaintiff on the eve of trial decided to undergo the extensive multiple surgeries. Dr. Nunley said that she first informed him by letter of her election after her serious considerations for surgery in the spring and summer of 2010. Nevertheless, she wanted to further delay the surgeries until she retired from her employment. In the Second Deposition, Dr. Nunley first reveals that a single fusion surgery involving L 3-4 was now to be expanded for fusion of L 2-3 and L 3-4, along with a complete fusion with L 4-5 which had been previously fused. Additionally, Dr. Nunley revealed a fusion procedure for C 4-5 and C 5-6. All told, instead of one fusion surgery, Dr. Nunley identified two separate surgeries involving what he described as six fusion procedures for a cost of $452,686. The City demonstrated this great contrast introducing as rebuttal testimony Dr. Nunley's First Deposition.
Dr. Nunley's newfound revelation regarding the plaintiff presented in the setting of the disputed Second Deposition represents such a drastic change in plaintiff's medical claim within days before trial that the basic fairness for trial was destroyed. The principle of supplementation of discovery responses of La. C.C.P. art. 1428(2) was certainly implicated. The City's valid refusal to attend the Second Deposition and its later objection to the introduction of the deposition into evidence at trial required the trial court to recognize the unfairness of the situation and the violations of its standing Scheduling Order and La. C.C.P. art. 1450. Either a continuance was appropriate to assess the newly revealed medical evidence and allow for the IME or the Second Deposition was an inadmissible late discovery response improperly offered as an evidentiary deposition in violation of La. C.C.P. art. 1450.
In presenting plaintiff's oral argument to the trial court disputing the need for a continuance, counsel emphasized that by March of 2010, the case was ready for trial and all discovery exchanged. This timeline presented to the trial court failed to note that within weeks before trial plaintiff first elected, after much reluctance, six fusion procedures of her spine and that in a disputed deposition on the eve of trial Dr. Nunley had first revealed his plans for two major surgeries. If the case was ready for trial in March 2010, Dr. Nunley's *776 First Deposition, the "trial" deposition to which the parties had agreed, revealed an entirely different case. The denial of the City's request for a continuance requires a reversal in this case.
NOTES
[1] Notably, although this issue was brought before this court pretrial via a request for supervisory writ, this court denied the writ on the grounds that supervisory jurisdiction was not warranted. Therefore, because this court did not make a ruling on the merits, consideration of this issue is not barred on appeal. This assignment of error warrants discussion on the merits in this appeal. See State v. Dressner, 2008-1366 (La.07/06/10), 45 So.3d 127.
[2] As with the rationale in the prior assignment of error, this issue was also brought before this court previously via a request for supervisory writ; this court denied the writ, not on the merits, but on the finding that supervisory jurisdiction was not warranted. Therefore, we will discuss the merits of this issue in this appeal. State v. Dressner, supra.