Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,720-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BENJAMIN PERRY                                    Plaintiff-Appellant

versus

STARR IMDEMNITY &                                 Defendants-Appellees
LIABILITY COMPANY,
HUMBERTO MATA AND
YELLOWJACKET OILFIELD
SERVICES, L.L.C.

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 148883

Honorable Michael Owens Craig, Judge

* * * * *

MORRIS, DEWITT & SAVOIE, LLC            Counsel for Appellant
By:  Brandon Trey Morris                Benjamin Perry
     G. Adam Savoie
     Meagan E. Shadinger


LAW OFFICES OF KYLE M. ROBINSON
By:  Kyle M. Robinson

GIEGER, LABORDE & LAPEROUSE, LLC          Counsel for Appellees
By:  Rachel Guajardo Webre                Starr Indemnity &
     Michael D. Cangelosi                 Liability Company and
                                          Humberton Mata


THOMPSON, COE, COUSINS, & IRONS           Counsel for Appellee
By:  Scott T. Winstead                    Yellowjacket Oilfield
     Doris Ann Louise Royce               Services, LLC

\* \* \* \* \*

Before PITMAN, GARRETT, and STONE, JJ.


PITMAN, J., concurs in the result.

GARRETT, J., concurs in the result.

**STONE, J.**

## FACTS AND PROCEDURAL HISTORY

Benjamin Perry (the "plaintiff") suffered back and neck injuries in an automobile collision on September 14, 2015. He was a passenger in a Ford F-250 driven by Humberto Mata ("Mata"), who crashed the F-250 into the rear end of another vehicle. Mata was in the course and scope of his employment for Yellow Jacket Oilfield Services, LLC ("Yellow Jacket"), at the time of the collision. Starr Indemnity & Liability Company ("Starr") issued a liability insurance policy covering Mata and Yellow Jacket in connection with the subject accident. The plaintiff filed a personal injury action against Mata, Yellow Jacket, and Starr, which was decided via jury trial held in April of 2018.

In early January of 2017, Dr. Donald Smith ("Dr. Smith") conducted a physical examination of the plaintiff pursuant to La. C.C.P. art. 1464. Dr. Smith testified that, in his medical examination of the plaintiff, the plaintiff denied having any pre-existing neck or back conditions.

The trial court admitted Dr. Smith as an expert in spine surgery. He testified that he reviewed the plaintiff's pre-accident and post-accident medical records relating to his back and neck pain. These records reflect that the plaintiff obtained treatment for back and neck pain on numerous occasions prior to the accident, as early as 2009, when the plaintiff told his chiropractor that he felt "90 years old." The pre-accident medical records revealed that the plaintiff, at times, suffered significant pain if he stood or sat for too long, and sometimes could not sleep well because of his pain. He also rated his back pain as high as "7/10," and only as low as "5/10," months before the accident. The plaintiff underwent treatment for these pre-existing

conditions within the year preceding the subject collision, and was diagnosed with a herniated disc in 2015, prior to the wreck. Dr. Smith opined that the post-accident MRIs of the plaintiff's spine reflected pre-existing degenerative disc disease in two joints of his cervical spine and two joints of his lumbar spine. He further described the affected lumbar joints as bulging discs. On cross-examination, the plaintiff admitted that he suffered from pre-existing back injuries significant enough that he once required emergency room treatment and narcotic pain medication.

Dr. Smith opined that the wreck aggravated the plaintiff's pre-existing conditions in both his low back and his neck. However, Dr. Smith stated that he believed the aggravation in the plaintiff's neck to be only temporary. Finally, Dr. Smith testified that it was difficult to precisely judge the extent of aggravation caused by the wreck (as opposed to what the plaintiff's condition would be had the wreck not occurred).

Dr. Pierce Nunley ("Dr. Nunley") began treating the plaintiff two days after the wreck. Dr. Nunley gave the plaintiff steroid injections in his cervical spine and lumbar spine to control his pain. The plaintiff had a total of six cervical injections between December 28, 2015, and a week before the trial in April of 2018. In January of 2017, Dr. Nunley conducted a two-level lumbar fusion surgery on the plaintiff. After the lumbar fusion surgery, the plaintiff only had two lumbar injections. Dr. Nunley explained that, during the first year after the surgery, these injections were necessarily limited because the steroid could inhibit the bone fusion that the surgery was intended to cause.

Dr. Nunley was deposed in June of 2017. Therein, he testified he could not state that the plaintiff would probably need a cervical fusion

2

surgery in the future; however, he testified he would be able to render a prognosis after the plaintiff's one-year postoperative visit in January of 2018. Nonetheless, on June 27, 2017, (roughly 5 weeks after his deposition) Dr. Nunley collaborated with the plaintiff's lifecare planner, Lacy Sapp, and formulated the following lifecare plan for the plaintiff:

**Option 1**. The plaintiff would receive cervical and lumbar injections 3 to 4 times per year for the rest of his life, and, 20 to 30 years later, would have a second lumbar fusion at the levels adjacent to his prior fusion.[1]

**Option 2.** The plaintiff would undergo three additional spine surgeries: (1) a second lumbar fusion at the adjacent levels; (2) a cervical fusion; and (3) a second cervical fusion at the adjacent levels. Under this option, the plaintiff would also receive lumbar injections 3 to 4 times per year for the rest of his life.[2]

At trial, Dr. Nunley was accepted as an expert in spine research, spine treatment, and spine surgery. On direct examination, he testified that the wreck aggravated the plaintiff's pre-existing injuries and necessitated the future treatment outlined in the lifecare plan. He also testified that the wreck caused the plaintiff to go from having neck and back pain intermittently to

---

[1]Lacy Sapp testified that option 1 would cost $1,518,320. The plaintiff's economist, Dr. Michael Kurth, testified that, after adjusting for inflation, etc., the jury would need to award the plaintiff $2,612,313 to cover the cost of future treatment option 1.

[2] Lacy Sapp testified that option 2 would cost $1,193,000. Dr. Michael Kurth testified that after providing for inflation the jury would need to award $1,712,423 to cover the cost of future treatment option 2.

having such pain constantly, and that this pain would continue for the rest of the plaintiff's life.

Dr. Nunley stated at trial the plaintiff was more likely to need the course of treatment reflected in "option 2"than that reflected in "option 1."

However, on cross-examination, Dr. Nunley seemed to contradict himself regarding whether it was more likely than not that the plaintiff's need for the treatment in the lifecare plan would be nonexistent but for the accident:

> Q:… Do you agree that all the treatment that is in your life care plan is related solely more probably than not… to September 14, 2015 and what happened that night?
> A:… I think to say that its solely I don't think you can necessarily say that.
> Q: Because some of that care he would have received anyway because of the [pre-existing] condition of his back?
> A: Possibly.
> Q:… Can you say more probably than not that all of the care that you have recommended in the lifecare plan is related only to the [subject] accident…and nothing else?
> A: Well see here is the quandary. I can't say more probably than not that it wouldn't be.
> Q: So can you say more probably than not that it is?
> A: Correct.

Michael Frenzel ("Frenzel"), lifecare planning expert for the defense, testified that he reviewed Dr. Nunley's deposition and, based thereon, concluded that the creation of a lifecare plan was not warranted in this case. Frenzel explained that items of future care should only be included in the lifecare plan if: (1) the item of care is more probable than not to occur; and (2) it is related solely to the incident being sued upon. Frenzel testified that he so concluded because Dr. Nunley, in his deposition, did not testify as to specific items of future care that would more probably than not occur and which were related solely to the plaintiff's accident.

4

At trial, the defense confronted Dr. Nunley regarding the inconsistency between his deposition testimony, wherein he refused to testify that it was more probable than not that the plaintiff would need surgery in the future, and the lifecare plan, wherein he recommended up to three future surgeries as being more probably than not necessary for the plaintiff. At first, Dr. Nunley basically had no answer when asked the reason for such a remarkable change during the five weeks between his deposition and his creation of the lifecare plan:

> A: Uh, based on you know the patient, uh, what they needed to adjust to – to respond to, uh, different therapies and – and again, reasonable is also, you know, I said reasonable it is reasonable, but of few look at it from a scientific standpoint it's also more probable than not

Later, Dr. Nunley stated that "talking through it" with the plaintiff's life care planner brought about the changes in his opinion. Finally, Dr. Nunley explained that, in his deposition, he probably was thinking only about the near future, while in doing the lifecare plan, he was thinking about the rest of the plaintiff's life. He admitted, however, that he did not remember the questions in the deposition being limited to only the near future.

Additionally, Dr. Nunley admitted that, at the time he formulated the life care plan: (1) he did not recall the plaintiff ever revealing his pre-existing conditions to him (Dr. Nunley); and (2) he was completely unaware that a lifecare plan should only include care related solely to the accident at issue; and (3) he had not reviewed the plaintiff's pre-accident medical records at the time he did the lifecare plan.

Finally, Dr. Nunley qualified his recommendation of 3 to 4 steroid injections per year by stating that 4 is the "absolute maximum" number of injections that plaintiff could receive in a year, and that the injections should

only be given on an as-needed basis to treat pain symptoms. Dr. Nunley declined to testify that he had seen a patient receive 3 to 4 injections per year for even 10 years; likewise, he declined to testify that he knew of medical literature supporting such a practice. Dr. Nunley testified only that he had seen patients receive "multiple injections for multiple years."[3] Additionally, Dr. Nunley admitted that, once the plaintiff had a cervical fusion surgery, he would no longer need the steroid injections into his cervical spine.

Dr. Steve Allison ("Dr. Allison") performed a "functional capacity evaluation" on the plaintiff. He testified at trial that the plaintiff suffered a permanent loss of function as a result of the wreck. He further testified that the plaintiff has the following permanent physical safety limitations as a result of the wreck:

- lifting (shoulder to overhead) – do not exceed 40 pounds
- lifting (floor to waist) – do not exceed 50 pounds
- lifting (waist to shoulder) – do not exceed 40 pounds
- carrying, pulling, pushing – do not exceed 50 pounds
- crawling – never

Dr. Allison testified that, while the plaintiff may be physically capable of exceeding those limitations, it is unsafe for him to do so.

The plaintiff testified that, before the wreck, he engaged in the following activities: (1) deer hunting with a bow and arrow (during the season); (2) golfing every other weekend; (3) fitness/working out; (4) competing in triathlons; (5) fishing as often as possible; (6) "two-stepping"

---

[3] However, he did state that some pain doctors do administer more than four steroid injections per year, but he disagrees with that practice.

with his wife; (7) activities with his stepson, Kason. He testified that, post-accident, he cannot: golf, compete in triathlons, fish as frequently, two-step with his wife, deer hunt with a bow and arrow, or do the same activities with his stepson, Kason.

Specifically, the plaintiff testified that he could not lift the 50-pound sack of corn used for baiting deer, or draw the bowstring to shoot a deer. He testified that he cannot golf at all or compete in triathlons at all. He further testified that he has not been "two stepping" with his wife since the accident, and that he has difficulty sitting in the boat when fishing. The plaintiff also testified that, post-accident, he "definitely does not lift Kason," his older stepson. He was impeached on that point. After calling his attention to that testimony, the defense presented a picture of the plaintiff, post-accident, throwing Kason into the air (while they were in a swimming pool). That picture was taken on June 23, 2016, *i.e.,* approximately 9 months after the accident. Kason was around 10 years old at the time picture was taken.

In closing arguments, defense counsel suggested that the jury reduce the award for future medical expenses by 50% both the recommended number of annual steroid injections and the number of years that the plaintiff would receive them. The defense then suggested that the jury should further reduce the resulting future medical expenses total of $827,155 by 1/3 to account for the role of the plaintiff's pre-existing conditions in necessitating the future treatment outlined in the lifecare plan. The total after that suggested reduction came to $545,000, the exact amount of future medical expenses that the jury awarded.

The jury also awarded the plaintiff $250,000 for past and future physical pain and suffering, approximately $40,000 in lost wages, and

approximately $315,000 and past medical expenses, for a total of $1,149,509.27 in total damages. The jury refused to award the plaintiff damages for loss of enjoyment of life.

Thereupon, the plaintiff filed a motion for judgment notwithstanding the verdict ("JNOV") seeking to increase the award for future medical expenses and general damages. Regarding the future medical expenses, the plaintiff argued that his expert evidence was "uncontradicted," and that this left the jury no basis to award less than suggested by the plaintiff in his evidence.

The trial judge denied the JNOV and issued written reasons. Regarding future medical expenses, the trial judge found that the plaintiff's evidence was *not* uncontradicted. The trial judge cited *Green v. K-mart,* 2003-2495 (La. 5/25/2004), 874 So. 2d 838, for the proposition that the jury permissibly made a credibility determination regarding the amount of damages for future medical expenses. Therein, the Louisiana Supreme Court stated:

> Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.

*Green, supra* at 843.

The plaintiff urges three assignments of error in this appeal: (1) the jury's award of $545,000 for future medical expenses was so low as to be manifestly erroneous; (2) the jury's award of $250,000 for past and future physical pain and suffering was abusively low; and (3) the jury's award of $0.00 for loss of enjoyment of life was abusively low.

8

In rebuttal, the defense makes three arguments. First, the defense points out that the testimony of the plaintiff's medical expert, Dr. Nunley, was substantially impeached in regard to the plaintiff's future treatment needs and the causal relationship, if any, between those needs and the accident. Second, the defense contends that the plaintiff had serious pre-existing conditions and the degree of aggravation that the wreck caused was less than the plaintiff claimed. Third, the defense points out that the plaintiff's own testimony regarding his post-accident loss of enjoyment of life was his only support for that claim, and that the jury was within its discretion to reject that testimony.

## DISCUSSION

The fountainhead of Louisiana tort liability is La. C.C. art. 2315, which provides that "every act of man that causes damage to another obliges him by whose fault it happened to repair it." "The term 'damages' refers to 'pecuniary compensation, recompense, or satisfaction for an injury sustained.'" *McGee v. A C And S, Inc.*, 2005-1036 (La. 7/10/06), 933 So. 2d 770, 773, *citing Fogle v. Feazel,* 201 La. 899, 10 So. 2d 695, 698 (1942). In the tort context, La. C.C. art. 2315 authorizes compensatory damages, which are designed to restore the plaintiff to the state he would have been in but for the tort. *McGee, supra* at 774, *citing* Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law §7-1 (Michie 1996).

Compensatory damages are classified as either "special" or "general." *McGee, supra* at 774. On appeal, the standard of review applicable depends on the classification of the particular item of damages at issue. "Special damages" are those which have a ready market value, *i.e.*, their value can be determined with relative certainty. *Smith v. Escalon,* 48,129 (La. App. 2 Cir.

9

6/26/13), 117 So. 3d 576, 583. Future medical expenses are an item of special damages. *Guillory v. Insurance Co. of North America,* 96-1084 (La. 4/8/97) 692 So. 2d 1029, 1031-2. A jury's decision regarding special damages is subject to manifest error review. This standard only allows an appellate court to adjust a damages award where: (1) there is no reasonable factual basis for the jury's decision; and (2) the decision is clearly wrong. *Id.*

"General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms." *Smith* at 581 citing *Duncan v. Kansas City So. Ry. Co.*, 00-0066, p. 13 (La. 10/30/00), 773 So.2d 670, 682.

A jury's verdict regarding the amount of general damages, if any, awarded to a personal injury plaintiff is subject to abuse of discretion review. *Bouquet v. Wal-Mart Stores, Inc.*, 2008-0309 (La. 4/4/08), 979 So.2d 456, 458-9. The trier of fact is granted "vast discretion" in fixing general damage awards. *Duncan, supra* at 682. In determining whether an award is abusively low, "the evidence must be viewed in the light most favorable to the defendant." *Evans v. Kilbert,* 27, 101 (La. App. 2 Cir. 8/23/95) 660 So.2d 167, 168, citing *Higginbotham v. Ouchita Parish Police Jury,* 513 So.2d 537 (La. App. 2 Cir. 1987). An appellate court may disturb a damages award only after an articulated analysis of the facts reveals an abuse of discretion. *Bouquet, supra* at 459. A reviewing court's role is to examine the facts and circumstances of the case to determine whether the fact finder has abused its discretion. *Id.*

Only if such examination reveals an abuse of discretion is it appropriate for the appellate court to resort to review of prior similar awards. *Id.* The test is whether the subject award is "greatly disproportionate to the mass of past awards for truly similar injuries." *Id.* The appellate court, upon finding an abusively low award, increases the award to the lowest amount reasonable trier of fact could have awarded. *Smith, supra* at 581-82; *Evans v. Kilbert*, *supra* 27, 101 (La. App. 2 Cir. 8/23/95), 660 So. 2d 167, 168.

**Pre-existing conditions; future medical expenses**

In *Smith*, *supra*, we explained the parameters of the defendant's liability for aggravation of a pre-existing medical condition:

> A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Although the victim's damages may be greater because a prior condition was aggravated by the tort, the tortfeasor is, nevertheless, responsible for the consequences of his tort. Nevertheless, before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must also be established. (Internal citations omitted).

*Id*. at 581. Thus, regarding the aggravation of a pre-existing condition, the defendant is liable only for the "natural and probable consequences" of that aggravation. In *Baw v. Paulson*, 50,707 (La. App. 2 Cir. 6/29/16), 198 So.3d 186, 194-195, we held that the jury can properly reduce an award of future medical expenses to the extent they are necessitated by pre-existing conditions rather than the subject incident. A defendant is not liable for future medical expenses that would be incurred regardless of the aggravation.

***Pre-existing conditions.*** It was established at trial that the plaintiff had pre-existing medical problems with his lower back and neck, including

11

degenerative disc disease. Dr. Nunley testified that but for the collision, the plaintiff would not be having the neck and back problems to the same extent he is having now.

Dr. Nunley also admitted that he did not recall the plaintiff ever telling him about the plaintiff's pre-existing neck and back conditions, despite the numerous consultations, visits and treatments, and that he had not reviewed the plaintiff's medical records as of the time he made the lifecare plan.

Dr. Smith testified that the plaintiff's back and neck problems were caused by the combination of the wreck and plaintiff's pre-existing conditions. Importantly, Dr. Smith also testified that it was difficult to precisely judge the extent of aggravation caused by the wreck (as opposed to what the plaintiff's condition would be had the wreck not occurred).

*Future medical expenses*. The premise of the plaintiff's argument is that his experts – Dr. Nunley, Lacy Sapp, and Dr. Kurth – were the *only* experts to testify regarding the plaintiff's future medical treatment needs,[4] or the cost thereof. From that premise, which is not entirely true, the plaintiff concludes that his "uncontradicted" evidence sufficiently proved the cost and medical necessity of option 1, *supra*, or option 2, *supra*, and therefore the jury had no choice but to award damages accordingly. The plaintiff, in effect, would have this court hold that Dr. Nunley's testimony was binding on the jury – regardless of the defense's extensive impeachment of Dr. Nunley's testimony.

---

[4] Dr. Donald Smith was barred from testifying in that regard because the defendants failed to timely disclose Dr. Smith's opinions prior to trial.

12

The defendants make several arguments in rebuttal. First, they point out that both Dr. Nunley and Dr. Smith testified that spinal injections should only be prescribed on an as-needed basis to treat pain symptoms, and that Dr. Nunley testified that four injections per year was the "absolute maximum" that he would administer to the plaintiff. Dr. Nunley also conceded that, of the two options set forth in the lifecare plan, "option 2," involving a cervical fusion surgery, was more likely – and that, once the plaintiff had the cervical fusion, steroid injections to the cervical spine would be unnecessary. Based on that admission, the defense argues that it was reasonable for the jury to reject Dr. Nunley's initial testimony that the plaintiff would need 3 to 4 injections per year for the next 45 years (*i.e.*, his remaining life expectancy).

Second, Dr. Smith testified that both the pre-existing spinal condition and the subject collision were factors in the plaintiff's complaints and treatment post-accident. Dr. Smith further testified that it was difficult to judge the degree of aggravation of the pre-existing condition caused by the subject collision.

Third, on cross-examination of Dr. Nunley, the defense highlighted the substantial inconsistencies between Dr. Nunley's deposition testimony and his recommendations in the lifecare plan. Michael Frenzel, lifecare planning expert for the defense, testified that he reviewed Dr. Nunley's deposition and, based thereon, concluded that the creation of a lifecare plan was not warranted in this case. Frenzel explained that items of future care should only be included in the lifecare plan if: (1) the item of care is more probable than not to occur; and (2) it is related solely to the incident being sued upon. Frenzel stated that he based his conclusion on the fact that Dr.

13

Nunley, in his deposition, did not testify as to specific items of future care that would more probably than not occur and which were related solely to the plaintiff's accident. For instance, at trial, Dr. Nunley admitted that in his deposition testimony, he declined to state that future cervical surgery was probable for the plaintiff; he said he could not predict that probability.

Based upon the foregoing, the defense suggested in closing argument that the jury could properly reduce the amount of future medical expenses. We agree. Under *Green, supra*, the jury was entitled to substitute its common sense and judgment for the conclusions of Dr. Nunley. That is so for several reasons. First, Dr. Nunley vacillated regarding whether plaintiff would still need any of the items in the lifecare plan had he not been in the accident. Second, Dr. Nunley changed his recommendation – that the plaintiff receive 3 to 4 injections per year – to the plaintiff receiving injections on an as-needed basis, not to exceed the "absolute maximum" of 4 injections per year. Third, Dr. Nunley declined to testify that he had ever given a patient 3 to 4 steroid injections per year for even 10 years; he would only state that he had seen patients given "multiple injections for multiple years." However, he did state that pain doctors do administer such courses of treatment, but he disagrees with administering more than four steroid injections per year. Fourth, Dr. Nunley admitted that, once the plaintiff had a cervical fusion surgery, he would no longer need the steroid injections into his cervical spine.

Furthermore, *Baw*, *supra,* authorized the jury to reduce the award of future medical expenses to the extent it determined that they are necessitated by the plaintiff's pre-existing injuries. The jury did not commit manifest

error in making that determination. Accordingly, this assignment lacks merit and is denied.

**Physical pain and suffering**

The jury awarded the plaintiff $250,000 for past and future physical pain and suffering. The plaintiff asserts that $250,000 is abusively low. He cites the following as proof: (1) his post-accident lumbar fusion surgery; (2) Dr. Nunley's recommendation of up to three additional spine surgeries; (3) Dr. Nunley's testimony that the plaintiff would have back and neck pain for the rest of his life as a result of the subject collision; (4) the plaintiff's remaining life expectancy of 45 years. The plaintiff cites *Daigle v. City of Shreveport*, 46,429 (La. App. 2 Cir. 10/5/11), 78 So. 3d 753, *writ denied* 2011-2472 (La. 2/3/12), 79 So. 3d 1027, For the proposition that a $400,000 future pain and suffering award to a 69-year-old plaintiff needing two future spine surgeries was not an abusively high award.

The defense points out that the plaintiff admitted on cross-examination that he rated his back pain is highest 7/10 and only as low as 5/10 just months before the accident. He also admitted that he treated for lumbar, thoracic, and cervical spine problems for years prior to the accident, and was even diagnosed with a herniated disc within a year of the subject collision.

Additionally, the plaintiff's testimony was impeached at trial. Specifically, the plaintiff testified that, post-accident, he "definitely does not lift Kason," his older stepson. After calling his attention to that testimony, the defense presented a picture of the plaintiff, post-accident, throwing Kason into the air (while they were in a swimming pool). That picture was

15

taken on June 23, 2016, *i.e.,* approximately nine months after the accident.

Kason was around 10 years old at the time picture was taken.

We see no abuse of discretion in this award. This assignment of error lacks merit and is denied.

**Loss of enjoyment of life**

The jury awarded $0.00 for loss of enjoyment of life. The plaintiff asserts that this non-award was abusively low. The Louisiana Supreme Court, in *McGee, supra*, explained:

> Loss of enjoyment of life, in comparison [to pain and suffering]…refers to the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not the plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.
>
> ***

*Id*. at 775. The court also provided the following illustration of how the plaintiff's lifestyle can determine the availability of such an award:

> Consider, for example, two boys, one athletic and the other artistic, who are both involved in an accident and suffer similar injuries. Presumably, each boy should be awarded a similar quantum of damages for pain and suffering. However, the same injury may affect the boys very differently. The artist's lifestyle was not drastically altered by the accident, as he was able to resume his artistic activities after the accident, whereas the athlete's lifestyle is altered significantly, as he has to resign from his team and can no longer participate in athletics. Arguably, the athlete may be entitled to a greater pain and suffering award if he can demonstrate his mental anguish occasioned by the accident and its consequences. The athlete is damaged, however, well beyond his mental anguish over not being able to participate in athletics because now the athlete is forced to drastically alter his lifestyle as a result of his accident. The athlete is no longer able to participate in athletics, in competition or at practice, and has to find another avocation to fill his leisure time. Moreover, he no longer spends a significant

16

amount of time with his teammates and is forced to seek
out new friends. These detrimental changes in lifestyle go
uncompensated in an award for pain and suffering. Under
these circumstances, the drastic lifestyle change required
of the athlete, as compared with the artist, warrants an
additional award for the athlete's loss of enjoyment of
life.

*Id.*

As proof of loss of enjoyment of life, the plaintiff cites the testimony

of Dr. Steve Allison, whom the trial court accepted as an expert in physical

therapy and functional capacity evaluations. Dr. Allison performed a

"functional capacity evaluation" on the plaintiff. He determined that the

plaintiff suffered a permanent loss of function as a result of the wreck. He

further testified that the plaintiff has significant permanent physical safety

limitations as a result of the wreck.[5] Dr. Allison testified that, while the

plaintiff may be physically capable of going beyond those limitations, it is

unsafe for him to do so.

Regarding his change of lifestyle, the plaintiff testified that, before the

wreck, he engaged in the following activities: (1) deer hunting with a bow

and arrow (during the season); (2) golfing every other weekend; (3)

fitness/working out; (4) competing in triathlons; (5) fishing as often as

possible; (6) "two-stepping" with his wife; (7) activities with his stepson,

Kason. He testified that, post-accident, he cannot: golf, compete in

triathlons, fish as frequently, two-step with his wife, deer hunt with a bow

and arrow, or do the same activities with his stepson, Kason. Specifically,

the plaintiff testified that he could not draw the bowstring to shoot a deer

---

[5] Those limitations are as follows: do not exceed 50 pounds on lifting from floor to waist or on carrying, pushing, or pulling; do not exceed 40 pounds on lifting from waist to shoulder or shoulder to overhead; do not crawl ever.

17

because it requires 65 pounds of pressure. He testified that he cannot golf at all or compete in triathlons at all. He further testified that he has not been "two stepping" with his wife since the accident, and that he has difficulty sitting in the boat when fishing.

The jury apparently determined that the plaintiff's testimony lacked credibility. In light of the impeachment regarding throwing Kason in the air and his untruthful denial of the pre-existing conditions to Dr. Smith, the jury did not abuse its discretion in making that determination. The plaintiff's testimony was the only evidence he offered to prove how the accident detrimentally changed his lifestyle. Dr. Allison's testimony, accepted as true, did not establish the leisure activities that the plaintiff enjoyed prior to the accident. Likewise, Dr. Allison did not testify he could not safely shoot a deer with the bow and arrow because Dr. Allison did not testify regarding the amount of force necessary to draw the bowstring.[6] Similarly, Dr. Allison did not testify that the plaintiff could not safely sit in a boat, run in a triathlon, dance with his wife, or play golf. Accordingly, the only evidence that the plaintiff offered regarding his loss of enjoyment of life was his own testimony, which the jury rejected as lacking credibility. Therefore, the jury's refusal to award damages for loss of enjoyment of life was not an abuse of discretion. This assignment of error lacks merit.

## CONCLUSION

The judgment of the trial court is AFFIRMED. The plaintiff is taxed with all costs of this appeal.

---

[6] Dr. Allison did, however, mention that the plaintiff dragging a deer on the ground could exceed the 50-pound limitation on pulling if the force necessary to drag the deer was greater than that amount. Regardless, had the plaintiff testified that his pre-accident deer hunting included using more than 50 pounds of force to drag a deer on the ground, the jury would have been within its discretion to reject that testimony.

18