STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2019 CA 0552

RONALD HICKS

VERSUS

USAA GENERAL INDEMNITY COMPANY, ROBERT L. HARGER, JR.,
R.L. HARGER AND ASSOCIATES, INC., AND HARGER AND COMPANY,
INC.

JUDGMENT RENDERED: **MAR 2 5 2021**

* * * * * * *

Appealed from the
Eighteenth Judicial District Court
In and for the Parish of Pointe Coupee • State of Louisiana
Docket Number 47,326 • Division A

The Honorable J. Kevin Kimball, Judge Presiding

* * * * * * *

Brent E. Kinchen
William C. Helm
Stephen F. Butterfield
Baton Rouge, Louisiana

ATTORNEYS FOR APPELLANTS
DEFENDANTS—USAA General
Indemnity Company and
Robert L. Harger, Jr.


Patrick W. Pendley
Stanley P. Baudin
Nicholas R. Rockforte
Evan P. Fontenot
Plaquemine, Louisiana
    and
Rick Ward, III
Port Allen, Louisiana

ATTORNEYS FOR APPELLEE
PLAINTIFF—Ronald Hicks

* * * * * * *

BEFORE: MCCLENDON, WELCH, THERIOT,
HOLDRIDGE, AND WOLFE, JJ.

**WELCH, J.**

In this action for damages arising out of a motor vehicle accident, the defendants appeal a judgment rendered in accordance with a jury verdict, awarding damages to the plaintiff for injuries that he sustained as the result of the accident. For reasons that follow, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

On October 1, 2015, Ronald Hicks, an equipment operator and farm laborer, was a passenger in a four-door heavy-duty flatbed truck traveling westbound on Highway 190 in Pointe Coupee Parish when it was rear-ended by an automobile driven by Robert L. Harger, Jr. Mr. Harger was traveling at approximately sixty to sixty-five miles per hour with the traffic and never "hit the brakes" before crashing into the truck. As a result of the collision, the passenger side of the truck was pushed up and along the railing of the bridge on which the occupants were traveling for approximately fifty to sixty feet before falling back down onto the roadway. At the time of the accident, Mr. Hicks was in the course and scope of his employment with Nickie Rockforte Farms, LLC (Rockforte Farms), as were the driver of the truck and a rear-seat passenger.

On September 27, 2016, Mr. Hicks filed a Petition for Damages against Mr. Harger and USAA General Indemnity Company, the liability insurer of Mr. Harger's vehicle, alleging that he sustained personal injuries as a result of the accident, including injuries to his neck, back, and arm. R.L. Harger and Associates, Inc. and Harger and Company, Inc. were also named as defendants, but they were subsequently dismissed in consideration of the parties' stipulation that Mr. Harger was liable for the accident at issue.[1]

---

[1] Following the accident, Mr. Hicks received workers' compensation benefits for his injuries from Louisiana Workers' Compensation Corporation (LWCC), the workers' compensation insurer of his employer. On October 6, 2016, LWCC filed a Petition of Intervention in Mr.

After a four day trial, from May 14 through May 17, 2018, the jury rendered a unanimous verdict, finding that Mr. Hicks was injured as a result of the October 1, 2015 accident and awarding Mr. Hicks the following damages:

| | |
|---|---|
| Past Medical Expenses | $110,410.00 |
| Future Medical Expenses | $285,000.00 |
| Past and Future Physical Pain & Suffering | $300,000.00 |
| Past and Future Mental Anguish | $300,000.00 |
| Past and Future Loss of Enjoyment of Life | $55,500.00 |
| Disability | $55,500.00 |
| Past Lost Wages | $36,000.00 |
| Loss of Earning Capacity | $156,000.00 |
| TOTAL | $1,298,410.00 |

On May 25, 2018, the trial court signed a judgment in conformity with the jury's verdict.[2] Thereafter, the defendants filed a Motion for New Trial, or in the Alternative, Motion for Remittitur. On August 9, 2018, following a hearing, the trial court denied the motion and signed a judgment. The defendants now suspensively appeal both the May 25, 2018 and August 9, 2018 judgments of the trial court.[3]

---

Hicks's lawsuit, seeking recovery or reimbursement of all workers' compensation payments to Mr. Hicks.

[2] Pursuant to a stipulation of the parties, the judgment also set forth that it was rendered in favor of LWCC recognizing its entitlement to recovery or reimbursement of amounts paid to Mr. Hicks.

[3] Generally, the denial of a motion for new trial is a non-appealable interlocutory judgment. See La. C.C.P. art. 2083. However, the Louisiana Supreme Court has directed us to consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits as well, when it is clear from the appellant's brief that he intended to appeal the merits of the case. Jackson v. Wise, 2017-1062 (La. App. 1st Cir. 4/13/18), 249 So.3d 845, 849-50, writ denied, 2018-0785 (La. 9/21/18), 252 So.3d 914. Furthermore, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment. Jackson, 249 So.3d at 850. Thus, the interlocutory denial of a motion for new trial is subject to review on appeal in connection with the review of an appealable judgment in the same case. Id. Herein, it is obvious

## II. ASSIGNMENTS OF ERROR

On appeal, the defendants raise several assignments of error that can be summarized as follows: (1) the trial court legally erred in: (a) excluding evidence of a drug test taken by Mr. Hicks, which was positive for cocaine, during his treatment with Dr. Joseph Turnipseed, Mr. Hick's pain management doctor, and (b) denying the defendants' request for an additional medical examination (AME) of Mr. Hicks pursuant to La. C.C.P. art. 1464, and that these two evidentiary legal errors were prejudicial, interdicted the fact-finding process of the jury, and warrant the *de novo* review of the record by this Court; (2) the trial court erred in denying the defendants' motion for new trial based on Mr. Hicks's failure to provide his 2017 W-2 before trial; and (3) with regard to damages, (a) the jury erred in awarding damages for future medical treatment because Mr. Hicks's failed to prove that future treatment would more probable than not be required; (b) the jury erred in awarding Mr. Hicks damages for loss of earning capacity since Mr. Hicks continued to work full time after the accident and through trial; and (c) the jury abused its discretion in awarding excessive general damages.

## III. LAW AND DISCUSSION

### A. Pre-Trial Evidentiary Rulings

First on appeal, the defendants contend that certain evidentiary errors were prejudicial and interdicted the jury's fact-finding process.[4] Specifically, the defendants maintain that the trial court's rulings (1) granting the plaintiff's motion *in limine* to exclude evidence that Mr. Hicks had been terminated by Dr. Turnipseed for cocaine use during his medical treatment, and (2) denying their

---

from the defendants' brief that they intended to appeal the judgment on the merits. Thus, we will treat the appeal accordingly.

[4] Because a finding of an evidentiary error may affect the applicable standard of review, in that this court must conduct a *de novo* review if the trial court commits an evidentiary error that interdicts the fact-finding process, alleged evidentiary errors must be addressed first on appeal. **Devall v. Baton Rouge Fire Dept.,** 2007-0156 (La. App. 1st Cir. 11/2/07), 979 So.2d 500, 502.

motion to compel an AME, constituted legal and reversible error. Moreover, the defendants argue that based on these errors, we should conduct a *de novo* review of the record for damages.

The standard of review for evidentiary rulings of a trial court is abuse of discretion. **Bristol v. Gonzales Police Department**, 2017-0675 (La. App. 1ˢᵗ Cir. 12/21/17), 240 So.3d 232, 243-44, writ denied, 2018-0146 (La. 3/23/18), 239 So.3d 296. If the trial court has abused its discretion in its evidentiary rulings, such that the jury verdict is tainted by prejudicial errors, the appellate court should conduct a *de novo* review. See **McLean v. Hunter**, 495 So.2d 1298, 1304 (La. 1986). Errors are prejudicial when they materially affect the outcome of the trial and deprive a party of substantial rights. **Evans v. Lungrin**, 97-0541 (La. 2/6/98), 708 So.2d 731, 735. Thus, a *de novo* review should not be undertaken for every evidentiary error, but should be limited to errors that interdict the fact-finding process. **Wingfield v. State ex rel. Dept. of Transp. and Development**, 2001-2668 (La. App. 1ˢᵗ Cir. 11/8/02), 835 So.2d 785, 799, writs denied, 2003-0313, 2003-0339, 2003-0349 (La. 5/30/03), 845 So.2d 1059-60, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003).

Consequently, in reaching a decision on an alleged evidentiary error, the court must consider whether the challenged ruling was an abuse of the trial court's discretion and whether the error prejudiced the adverse party's cause; for unless it did, reversal is not warranted. **Wallace v. Upjohn Co.**, 535 So.2d 1110, 1118 (La. App. 1ˢᵗ Cir. 1988), writ denied, 539 So.2d 630 (La. 1989); La. C.E. art. 103. Moreover, the party alleging error has the burden of showing the error was prejudicial to the case. **Brumfield v. Guilmino**, 93-0366 (La. App. 1ˢᵗ Cir. 3/11/94), 633 So.2d 903, 911, writ denied, 94-0806 (La. 5/6/94), 637 So.2d 1056. Ultimately, the determination is whether the error, when compared to the record in

its totality, has a substantial effect on the outcome of the case. **Wallace**, 535 So.2d at 1118.

1. Evidence of Cocaine Use

Before trial, Mr. Hicks filed a motion *in limine* seeking to exclude the introduction of any evidence or discussion regarding the results of a drug test he contended was inaccurate. The defendants argued, however, that Mr. Hicks had signed a contract with Dr. Turnipseed agreeing to refrain from illegal drug use during his treatment with Dr. Turnipseed, and that Mr. Hicks's violation of the agreement was highly relevant as to Mr. Hicks's credibility and his need for future medical treatment. After a hearing, the trial court granted the motion, stating in its judgment that "no such evidence or argument can be presented to the jury concerning the drug screen or [Mr. Hicks's] alleged illicit drug use." The trial court found that, despite the alleged irregularities with the test, the prejudicial effect of the evidence outweighed its benefit. Therefore, the trial court precluded the defendants from putting on any evidence showing that Dr. Turnipseed had fired Mr. Hicks as a patient because a drug test came back positive for cocaine, and Mr. Hicks's medical records were redacted to remove any reference to his use of cocaine.

On appeal, the defendants argue that the trial court's exclusion of evidence that Dr. Joseph Turnipseed fired Mr. Hicks as a patient based on his cocaine use was erroneous and that such ruling was prejudicial error because the cocaine issue featured prominently at trial.

Louisiana Code of Evidence article 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Additionally, La. C.E. art. 403 provides:

6

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

At trial, the trial court allowed the defendants to bring up the fact that Mr. Hicks was fired by Dr. Turnipseed for failing to follow the doctor's recommended treatment. Thereafter, on cross examination, Mr. Hicks was questioned about being terminated by Dr. Turnipseed.[5] On redirect examination, Mr. Hicks was then asked: "There was also a question about terminating a relationship with Dr. Turnipseed at some point and the reason that that was done, can you tell us if it had to do with you not taking your Neurontin medication?" Defense counsel immediately objected. The defendants assert that this question misled the jury and planted a seed in the mind of the jurors that Mr. Hicks was fired simply because of failing to take a prescribed medication, rather than for taking an illegal drug. Following a sidebar discussion, during which the defendants argued that counsel for Mr. Hicks opened the door to a discussion of Mr. Hicks's cocaine use, the trial court sustained the defendants' objection and advised Mr. Hicks not to answer the question. The defendants contend that the jury was deprived of learning the truth and that the trial court's exclusion of this evidence was legal error, requiring *de novo* review.

---

[5] While talking about Dr. Turnipseed, defense counsel asked Mr. Hicks the following:

Q. And when you went to him, he gave you a contract to sign; is that correct?

A. Yes.

Q. And in that contract, you said you were going to follow his instructions and not do certain things; right?

A. Yes.

Q. And he took a drug test of you and he terminated the relationship with you; is that correct?

A. Yes.

After our review, we find no abuse of the trial court's discretion nor do we discern any prejudice or injustice resulting from the trial court's ruling to exclude Mr. Hicks's alleged use of cocaine. The trial court thoroughly considered this issue and found the evidence more prejudicial than probative. Further, given that the defendants timely objected to the question by Mr. Hicks's counsel regarding Mr. Hicks's failure to take certain medication and the trial court ordered Mr. Hicks not to answer the question, we can find no prejudice to the defendants as to this issue. Consequently, we find that a *de novo* review of the record based on the exclusion of the evidence regarding the use of cocaine by Mr. Hicks is not warranted.

## 2. Additional Medical Examination

The defendants also contend that it was legal error for the trial court to deny their request for an AME by Dr. Chambliss Harrod, defendants' expert orthopedic surgeon, and that this legal error was outcome determinative. They assert that their request that Mr. Hicks be examined by Dr. Harrod was based on the "ever-evolving surgical recommendations" of Mr. Hicks's treating surgeon, Dr. Jorge Isaza.

In November 2017, the defendants filed a motion to compel an AME, alleging that one of Mr. Hicks's treating physicians, Dr. Jason Smith, an orthopedic specialist, was of the opinion that Mr. Hicks was not a candidate for lumbar surgery, while another treating physician, Dr. Jorge Isaza, also an orthopedic surgeon, believed that lumbar surgery might be necessary in the future.[6] Therefore, according to the defendants, an AME was necessary to evaluate Mr. Hicks's condition and the extent of his alleged injuries. The defendants further argued that they would be unfairly prejudiced in developing their defense as to Mr.

---

[6] The defendants later asserted that two weeks before trial, Dr. Isaza changed his medical opinion and recommended an anterior discectomy and fusion at L5-S1 for Mr. Hicks.

Hicks's injuries and the extent of his injuries if they were not permitted to have Mr. Hicks submit to an examination and evaluation by a physician of their own choosing.

Mr. Hicks opposed the motion, contending that the two orthopedic specialists and treating physicians of Mr. Hicks had already rendered their opinions and a third opinion by a defense orthopedist was not necessary.[7] Mr. Hicks also argued that Dr. Harrod was undeniably biased in favor of the defendants. Moreover, Mr. Hicks maintained that Dr. Smith was provided to him by his workers' compensation insurer and was in essence an independent doctor.

Not long after the defendants filed their motion to compel an AME by Dr. Harrod, Mr. Hicks filed a motion seeking to strike the defendants' expert witness, Dr. Robert Branstetter, and to exclude his testimony. Dr. Branstetter, a radiologist, was hired by the defendants to review Mr. Hicks's x-rays and MRI films. Mr. Hicks asserted that the identification of Dr. Branstetter as a medical expert was untimely as he was named after the court's deadline to identify expert witnesses had passed. In response, the defendants argued that since they had been unable to schedule an AME of Mr. Hicks by Dr. Harrod, they sent the films to Dr. Branstetter for review.[8]

At the hearing on the motions, during the discussion regarding the request for an AME, the defendants argued that if they were not allowed to conduct an examination, the failure to conduct an examination would be used against them.[9]

---

[7] Mr. Hicks was also treated by Dr. Timothy Bowlin, an orthopedic surgeon, for his complaints of neck and arm pain. On September 19, 2016, Dr. Bowlin performed two outpatient surgeries for severe carpel tunnel syndrome and severe cubital tunnel syndrome, which were nerve compression injuries to Mr. Hicks's left wrist and elbow that Dr. Bowlin directly related to the accident.

[8] The defendants had attempted to schedule an examination by Dr. Harrod, but discussions between counsel for the parties regarding the parameters of the examination proved unsuccessful.

[9] The following colloquy took place:

After the hearing, the trial court determined that although Mr. Hicks had placed the physical condition of his body in controversy by filing suit alleging personal injuries, "good cause" did not exist for an AME by Dr. Harrod. However, the trial court also ruled that Dr. Harrod or Dr. Branstetter could examine Mr. Hicks's medical records and testify based on those records.

Louisiana Code of Civil Procedure article 1464,[10] which governs AME's provides, in pertinent part:

A. When the mental or physical condition of a party, ... is in controversy, the court in which the action is pending *may* order the party to submit to an additional medical opinion regarding physical or mental examination by a physician or to produce for examination the person in his custody or legal control, except as provided by law. ... *The order may be made only on motion for good cause shown* and upon notice to the person to be examined and to all parties *and shall specify the time, place, manner, conditions, and scope* of the examination and the person or persons by whom it is to be made.

B. Regardless of the number of defendants, *a plaintiff shall not be ordered to submit to multiple examinations by multiple physicians within the same field of specialty for the same injury except for good cause shown.* [Emphasis added.]

---

The Court:
I quess my big question regarding whether or not to do the IME [*sic*], is I read everything and it looks like there was a lot of stuff in there that the IME [*sic*] is going to consist of ... a twenty or thirty minute visit. ...
--you can look at it two ways, really, you can say, oh, that's not very intrusive, but then at the same time you can look at it and say, what could he possibly learn by looking at him for twenty minutes, that he couldn't learn from the medical records. So – okay.

Mr. Kinchen:
Here's the response to that, Judge and I understand your point. I guarantee you that my friend here, at trial, is going to argue that he didn't even see him, Judge – I mean Jury, how can he make an opinion, he didn't even look at him. So, that's why I need the IME [*sic*].

[10] Louisiana Code of Civil Procedure Article 1464 was amended by Acts 2017, No. 381, § 1, eff. June 23, 2017. The defendants filed their motion to compel an AME of Mr. Hicks by Dr. Harrod in November 2017. The amendment provided that an examination ordered under La. C.C.P. art. 1464 is now referred to as an "additional medical examination" ("AME") as opposed to an "independent medical examination" ("IME"). Relevant to this matter, La. C.C.P. art. 1464 now specifically provides that "a plaintiff shall not be ordered to submit to multiple examinations by multiple physicians within the same field of specialty for the same injury except for good cause."

In accordance with La. C.C.P. art. 1464, the party moving for an AME must demonstrate: (1) that the physical or mental condition of the party sought to be examined is in controversy and (2) that good cause exists for requiring the party to submit to the examination. **Daigle v. City of Shreveport**, 46,429 (La. App. 2nd Cir. 10/5/11), 78 So.3d 753, 761-62, writ denied, 11-2472 (La. 2/3/12), 79 So.3d 1027; **Leaf v. Leaf**, 2001-1417 (La. App. 4th Cir. 8/15/01), 796 So.2d 42, 44-45. See also **Schlagenhauf v. Holder**, 379 U.S. 104, 118-19, 85 S.Ct. 234, 242-43, 13 L.Ed.2d 152 (1964). Notably, "good cause" is not defined in La. C.C.P. art. 1464. Additionally, La. C.C.P. art. 1464 requires the mover to specify the "scope of the examination." See **Williamson v. Haynes Best Western of Alexandria**, 595 So.2d 1201, 1204 (La. App. 4th Cir.), writ denied, 598 So.2d 376 (La. 1992) (where the court held that even in the event that the defendant demonstrated good cause, the defendants failed to set forth the scope of an examination of the plaintiff because it failed to specify tests to be performed on the plaintiff during the examination).

The purpose of limiting examinations under La. C.C.P. art. 1464 is to restrict the circumstances under which a party may be required to submit his mind or body for examination, thus balancing considerations of the sanctity of the body and the right to privacy with considerations of fairness in the judicial quest for truth. **Williams v. Smith**, 576 So.2d 448, 451 (La. 1991).[11] See also **Hogan v. Morgan**, 2006-0808 (La. App. 1st Cir. 4/26/07), 960 So.2d 1024, 1028, writ denied, 07-1122 (La. 9/14/07), 963 So.2d 1000. Importantly, the ability of the moving party to obtain the desired information by other means is relevant in deciding whether good cause was shown for ordering an AME. See **Williams**, 576 So.2d at 452; **Daigle,**

---

[11] We note that in **Williams**, 576 So.2d at 450, the Louisiana Supreme Court pointed out that Federal Rule 35 of the Federal Rules of Civil Procedure is the source provision of La. C.C.P. art. 1464 and that Louisiana courts have relied on prior interpretations of Rule 35 by federal courts as persuasive guides to the intended meaning of La. C.C.P. art.

78 So.3d at 762.[12] The trial court has wide discretion in determining whether an AME should be ordered, and that decision should be based upon the individual facts and circumstances of each case. **Daigle**, 78 So.3d at 762; **Leaf**, 796 So.2d at 45.

In this matter, we agree with the trial court that Mr. Hicks placed his physical condition "in controversy" by filing this suit for damages for personal injuries. Therefore, the first requirement of La. C.C.P. article 1464 was satisfied. It is the second requirement—whether "good cause" existed for ordering Mr. Hicks to submit to an AME—that is at issue.

After hearing the argument of counsel at the hearing on the motion to compel, the trial court stated:

> Okay, Guys, from everything I've read, I find that – I think that the defense can – has already gotten all of the information with regard to the MRI's. The doctors have all been deposed, and I think that's why I was asking. I think it was the **Daigle** case that set forth these factors as to the burden.
>
> Of course, you know, the cases go back and they talk about two things. One, is the matter in controversy? Of course it's in controversy, because they're suing for injuries. So, that's a no-brainer. But, the question of good cause, it looks like a lot of the courts have been finding that you've got to have a burden of good cause and based on that **Daigle** case, the factors were whether the info sought can be obtained through least intrusive means, which, you know, looking at what I've read, yes, I think it can. Whether plaintiff's doctors are available for deposition. They have been deposed.
>
> You know, there's a question about the doctor's reputation that's been brought up, whether the doctor's plaintiff or defense. I mean, I think that's kind of going to go in every case, you're going to have plaintiff's lawyers hiring plaintiff's oriented doctors and vice versa. And then the last one, the treating physician's has already had – I think that's the factors I've read in **Daigle**, has more experience with the plaintiff's condition.

---

[12] See also **Williamson v. Hartford Casualty Insurance Company**, 2017-1073 (La. App. 1st Cir. 9/6/17), 2017 WL 3888827 (unpublished writ action) ("[m]ere relevance of the information sought in the examination is not sufficient to establish good cause, and the ability of the movant to obtain such information through other methods is germane to the determination of good cause," citing **Schlagenhauf**, 85 S.Ct. at 242-43, 379 U.S. at 118, 13 L.Ed.2d 152.)

I just feel that from what I understand the perimeters of this, whether it's an AME or DME or IME, whatever it may be, I just find that the twenty minutes gained from that would probably not have a whole lot of bearing on the doctor's finding – the IME's finding, because he's got to look at the – and naturally to determine whether he's going to have surgery or not, you're going to look at the MRI's and other medical records. So, I'm going to find that there hasn't been good cause shown for the IME.[13]

In support of their argument that the trial court erred in refusing to allow the additional medical examination by Dr. Harrod, the defendants allege that Mr. Hicks's counsel improperly used the pretrial ruling prohibiting an examination, to undermine the credibility and reliability of Dr. Harrod's medical opinion and to mislead the jury, by stating in closing arguments that Dr. Harrod's testimony was not credible as he had not examined Mr. Hicks. Furthermore, the defendants particularly pointed out that during deliberations, the jury asked the question, "Was Dr. Harrod allowed to see him?" The trial court declined to answer the jury's question.[14] The defendants now assert that, unquestionably, the jury's inquiry proved that the issue of an AME weighed heavily in this matter and that the trial court's error irreparably tainted the jury's verdict, requiring a *de novo* review by this court. We disagree.

The record shows that following the October 1, 2015 accident, Mr. Hicks was originally referred to Dr. Jason Smith, an orthopedic surgeon, as part of Mr.

---

[13] We note that the defendants did not seek supervisory review with this court of the denial of their motion to compel the additional medical examination. Rather, the defendants sought review of the denial of their motion to continue the trial, based on their need for an additional medical examination by Dr. Harrod. The writ application was denied on the showing made. See **Hicks v. USAA General Indemnity Company**, 2018-0613 (La. App. 1st Cir. 5/10/18), 2018 WL 2175892.

[14] This question was one of a list of three that the jury asked the trial court to answer. The questions were:

1) What was the first offer?
2) Was Dr. Harrod allowed to see him?
3) Will he get a disability check from the state?

After discussion with counsel, the trial court concluded, and counsel agreed, that none of the questions should be answered by the court. Thereafter, the trial court advised the jury that it could not answer its questions and that to the extent the questions could be answered from the evidence, the jury heard the evidence and was the decider of facts.

Hicks's workers' compensation claim. Upon examination of Mr. Hicks, Dr. Smith, whose deposition was read at trial, found no evidence of obvious trauma. Rather, he determined that the MRI of Mr. Hicks's lower back was indicative of degenerative disc disease and that the accident most likely aggravated the preexisting underlying degenerative condition. Further, although Dr. Smith did not believe that Mr. Hicks exaggerated his pain, he was of the opinion that Mr. Hicks was not a surgical candidate. Mr. Hicks subsequently ceased treatment with Dr. Smith, who last saw him on January 6, 2017.[15]

Mr. Hicks was later referred to Dr. Isaza by his attorney. Dr. Isaza was initially having trouble identifying the primary source of Mr. Hicks's lumbar pain. However, after a selective nerve block procedure shortly before trial, Dr. Isaza and Dr. Turnipseed agreed that the majority of Mr. Hicks's pain was emanating from his L5-S1 disc. On April 24, 2018, approximately three weeks before trial, Dr. Isaza recommended an anterior discectomy and fusion at L5-S1.

After receiving notice of the surgical recommendation by Dr. Isaza, the defendants sought a continuance of the trial date, arguing that Dr. Harrod needed an opportunity to examine Mr. Hicks in order to fairly evaluate Dr. Isaza's recommendation for surgery. However, the trial court denied the continuance. The defendants sought supervisory relief with this court, which was denied on the showing made.[16] The matter then proceeded to trial.

---

[15] Mr. Hicks's treatment with Dr. Smith ceased upon his referral to Dr. Isaza.

[16] We find no merit to Mr. Hicks's argument in his brief that the "law of the case" doctrine precludes this court from re-examining the issue of the trial court's denial of the defendants' request for an AME. Mr. Hicks contends that when this court denied the defendants' writ application on the denial of their request for a continuance of the trial date based on the need for an AME, it became the law of the case. However, the denial of a writ by the reviewing court has no precedential value and should in no way be construed as an adoption of a court of appeal's ruling or reasoning. See **St. Tammany Manor, Inc. v. Spartan Bldg. Corp.**, 509 So.2d 424, 428 (La. 1987); see also **M.J. Farms, Ltd. v. Exxon Mobil Corp.**, 2007-2371 (La. 7/1/08), 998 So.2d 16, 24 n.12, and **Long v. State ex rel. Dept. of Transp. and Development**, 2004-0485 (La. 6/29/05), 916 So.2d 87, 91 n.7.

Dr. Harrod testified at trial by video deposition. At the beginning of his testimony, he stated that he had been limited to a review of Mr. Hicks's medical records. After the defendants' counsel pointed out that Dr. Harrod was not allowed to examine Mr. Hicks, Dr. Harrod testified that it would have been helpful to examine Mr. Hicks, stating that "[i]t is always helpful, I believe, to be able to see someone. There are certain things you really can't really get a full understanding for unless you see someone."

Thereafter, during closing arguments, counsel for Mr. Hicks argued:

You know, the problem with Dr. Harrod's testimony is I'm not saying - - he's probably a great doctor and I don't know him to be otherwise. But, the context in which he is presented in this case is diabolical. I got to be real with you. I mean, he was presented in a way to diminish the Plaintiff, that's all his [role] was to be here.

You know, he came into this case and **he never saw the patient. He said multiple times in order to make a decision, to make an opinion, he'd have to see him, and he didn't see him.** He has also been hired twenty-five to thirty times by the Defense Attorneys in this case. You heard that.

And one of the biggest criticisms that I have of his testimony in this case is he thinks that Dr. Turnipseed and Dr. Isaza are fabulous doctors. They've been doing it longer than him. In fact, he refers his clients to go see these guys still. He has no problem with their testimony, that's what he said when he's trying to treat patients and trying to make them feel better. But, when he's wearing a Defense hired gun hat, he changes all of this, critical of everything they say and do. **He cannot be believed, he's just not credible. He's not seen this patient.**[17]

(Emphasis added). After the jury was discharged to deliberate, the jury sent out a list of three questions that it requested the trial court to answer, one of which was: "Was Dr. Harrod allowed to see him?"

While there are no definitive guidelines as to what constitutes good cause, we recognize that in **Williamson v. Hartford Casualty Insurance Company,** 2017-1073 (La. App. 1st Cir. 9/6/17, 2017 WL 3888827 (*unpublished writ action*),

---

[17] As noted by the trial court during the hearing on the motion for new trial, the defendants failed to lodge an objection to the comments.

citing **Schlagenhauf**, 85 S.Ct. at 242-43, 379 U.S. at 118, the ability of the party seeking to compel the AME to obtain the information through other methods is germane to the determination of good cause. Herein, it is undisputed that Mr. Hicks was involved in a serious rear-end collision and that lumbar surgery was recommended shortly before the trial date.[18] As such, when the motion to compel the AME by Dr. Harrod was filed, Mr. Hicks had already treated with multiple physicians for his various injuries, including two orthopedic surgeons—Dr. Smith and Dr. Isaza—for his cervical and lumbar issues. Mr. Hicks saw Dr. Smith as part of his workers' compensation claim and Dr. Smith's opinion was not favorable to Mr. Hicks because he opined that Mr. Hicks was not a surgical candidate. Therefore, the defendants had the means—other than through an AME—to obtain information about Mr. Hicks' injuries and necessary treatment. Additionally, the defendants admitted at the hearing on the motion that they had already deposed Mr. Hicks' treating physicians and had received his medical records, including MRI images that were shown to their expert, Dr. Robert Branstetter. At the hearing, the defendants claimed that the proposed AME would not be invasive and that it would only last twenty minutes. As noted by the trial court, the short duration of the proposed AME suggests that it might not have been particularly invasive, but it also diminishes the defendants' argument that the examination would provide any evidence not already available given Mr. Hicks's continuing treatment history. Ultimately, the only argument set forth by the defendants that the AME was necessary was that it would be helpful to the defendants to prepare for trial—this is insufficient to establish good cause.

---

[18] Dr. Isaza also opined that at some point Mr. Hicks would require an anterior cervical discectomy with fusion for disc herniations at the C5-C6 and C6-C7 levels. However, Dr. Turnipseed's conservative treatment of Mr. Hicks's cervical issues was currently giving Mr. Hicks pain relief. Dr. Harrod did not dispute the cervical surgery recommendation attributed to the accident.

16

Perhaps if Dr. Harrod had reviewed the depositions of Mr. Hicks' treating physicians and his medical records prior to the hearing on the motion to compel, and thereafter specifically explained how a twenty minute examination of Mr. Hicks was still necessary for him to fully address Mr. Hicks' injuries, the defendants may have been able to demonstrate good cause for the examination. However, even after Dr. Harrod had ample time to review Mr. Hicks' medical records, when the defendants filed their motion to continue, the defendants still failed to specifically explain why an AME was necessary. Notably, the inability of Dr. Harrod to examine Mr. Hicks did not prevent him from testifying that Mr. Hicks was not a candidate for back surgery and that his neck and back problems were unrelated to the automobile accident.

Furthermore, while not mentioned by the trial court, the defendants also failed to specify the conditions and scope of the proposed AME, as required by La. C.C.P. art. 1464. The motion to compel the AME only requested that the trial court order Mr. Hicks to undergo a physical examination by Dr. Harrod at his office and at a time chosen by the trial court. As such, the trial court had no information to gauge how invasive the examination of Mr. Hicks would be.

As to the defendants' claim that Mr. Hicks' counsel made improper closing arguments, we note that the defendants failed to contemporaneously object to those arguments, and thus, waived their right to complain about same on appeal. La. C.C.P. art. 1635; **Karagiannopoulos v. State Farm Fire & Cas. Co.**, 94-1048 (La. App. 5th Cir. 11/10/99), 752 So.2d 202, 209, writ denied, 99-2866 (La. 12/10/99), 752 So.2d 165 (providing that objections to statements made during closing arguments must be made contemporaneously and the failure to lodge a contemporaneous objection in the trial court waives the right to complain on appeal). Additionally, we note that the trial court specifically instructed the jury that the arguments made by the attorneys were not evidence.

17

Based on our review of the record, we cannot say that the trial court erred in determining that the defendants failed to establish good cause for ordering an AME, and we also find that the defendants failed to specify the conditions and scope of the proposed AME, as required by La. C.C.P. art. 1464. Therefore, we do not find that the trial court abused its vast discretion in denying the defendant's request for an AME. Having determined that there were no legally erroneous evidentiary rulings by the trial court, we find no merit to the defendants' contention that a *de novo* review of the record by this Court is warranted.

## B. Motion for New Trial: Plaintiff's 2017 W-2

Louisiana Code of Civil Procedure article 1972 provides the peremptory grounds for a new trial, and it provides, in pertinent part, that "[a] new trial shall be granted, upon contradictory motion of any party, ...(1) [w]hen the verdict or judgment appears clearly contrary to the law and the evidence[,]" [or] (2) [w]hen the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial." Additionally, La. C.C.P. art. 1973 provides the trial court with discretionary authority to grant a new trial "in any case of there is good ground therefor, except as otherwise provided by law. When the trial court is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be granted pursuant to La. C.C.P. art. 1973. **Pitts v. Louisiana Medical Mutual Insurance Co.**, 2016-1232 (La. 3/15/17), 218 So.3d 58, 65. The standard of review of a denial of a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. **Rao v. Rao**, 2005-0059 (La. App. 1st Cir. 11/4/05), 927 So.2d 356, 361, writ denied, 2005-2453 (La. 3/24/06), 925 So.2d 1232.

The defendants contend that the trial court erred when it denied their motion for a new trial based on Mr. Hicks's failure to timely provide his 2017 W-2 prior to

18

trial. The defendants maintain that they had no knowledge that Mr. Hicks was working the same number of hours after the accident as he had worked before the accident, although Mr. Hicks claimed that he was severely injured and unable to work. The defendants assert that, despite repeated requests for updated wage and tax information from Mr. Hicks, they did not receive this information until the middle of the cross-examination of Mr. Hicks's last witness, Dr. G. Randolph Rice, an expert in the field of economics. Therefore, according to the defendants, they did not have the information available to impeach the testimony of Mr. Hicks and his doctors during cross-examination. The defendants further assert that Mr. Hicks's willful failure to supplement his discovery responses interdicted the fact-finding process requiring *de novo* review of the record.

To the contrary, Mr. Hicks claimed that the defendants were fully aware of his 2017 work status. Mr. Hicks pointed to his deposition and the depositions of two co-workers and his employer, all taken in 2017, wherein each testified that Mr. Hicks was working in 2017. The defendants' economist, Larry Stokes, also testified at trial that he had interviewed Mr. Hicks, who informed him that he was working in 2017. Mr. Hicks also claims that the defendants were mischaracterizing his ability to work. Mr. Hicks testified in his deposition and at trial that in 2017 he worked seasonally on and off during the sugarcane harvest season, which was from September through December.

Mr. Hicks also points to the defendants' discovery request, asking for "[a] copy of all federal and state income tax returns, including W-2 forms, filed by you for the last five years, inclusive of the current year." Mr. Hicks contends that the request was mailed on December 6, 2016, and there was never a formal discovery request for a 2017 W-2 tax form. Additionally, Mr. Hicks argues that although the defendants assert that they requested the tax information in the weeks leading up to trial, the emails between the parties requested tax returns, not a W-2 form.

Nevertheless, Mr. Hicks contends that his counsel did not receive the 2017 W-2 until Sunday, the day before trial, and that counsel informed the defendants on Monday that he had just gotten the 2017 W-2 and would produce it if they needed it. However, according to Mr. Hicks, the defendants waited until Dr. Rice testified at trial regarding earnings data to request the information.[19]

Upon our review, we find that the defendants' discovery request was completed by the plaintiff when made. The defendants' request for production of documents did not specifically seek Mr. Hicks's 2017 W-2 and tax return. See La. C.C.P. art. 1428.[20] We also note that the defendants did not propound any formal request for supplementation of the previous discovery responses. See **Savoie-Moore v. Moore**, 98-0235 (La. App. 4th Cir. 9/16/98), 719 So.2d 551, 554 (providing that when discovery is answered and the record contains no evidence of a request for supplementation of prior discovery responses, a party is not required to supplement his responses). Additionally, the defendants were fully aware prior to trial that Mr. Hicks worked seasonally for his employer as a farm worker and

---

[19] The day after the testimony of Dr. Rice, and after the video deposition testimony of Dr. Harrod was played at trial, the defendants moved for a mistrial based on Mr. Hicks's alleged failure to timely produce the 2017 W-2 form. After discussion, the trial court denied the motion for mistrial.

[20] Louisiana Code of Civil Procedure art. 1428 provides:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.

laborer and that he worked for Rockforte Farms in 2017. Thus, this evidence was not a surprise to the defendants. At the sidebar discussion during Dr. Rice's testimony, defense counsel admitted that they knew that Mr. Hicks was working in 2017, based on his employer's deposition. Further, the defendants received the tax information shortly after it was obtained by Mr. Hicks's counsel. Therefore, under the facts and circumstances of this case, we find we find no error or abuse of the trial court's discretion in failing to grant or order a new trial.

## C. Damages

Compensatory damages are classified as either special or general. **McGee v. A C and S, Inc.**, 2005-1036 (La. 7/10/06), 933 So.2d 770, 774. "Special damages" are those which have a ready market value such that the amount of damages theoretically may be determined with relative certainty, including medical expenses and lost wages. *Id.* General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of gratification or physical enjoyment, or other losses of life or life-style which cannot be measured definitely in monetary terms. **Duncan v. Kansas City Southern Railway Co.**, 2000-0066 (La. 10/30/00), 773 So.2d 670, 682; see also **McGee**, 933 So.2d at 774.

On appeal, the defendants contend that the jury's total award for general damages ($711,000.00) was excessive and that the jury's awards for future medical expenses ($285,000.00) and for loss of earning capacity ($156,000.00) should be eliminated altogether.[21] The applicable standard of review depends on the classification of the particular item of damages at issue.

## 1. Future Medical Expenses

---

[21] On appeal, the defendants do not challenge the jury's damage awards of $110,410.00 for past medical expenses and $36,000.00 for past lost wages.

Future medical expenses are an item of special damages. **McGee**, 933 So.2d at 774; see also **Guillory v. Insurance Co. of North America**, 96-1084 (La. 4/8/97), 692 So.2d 1029, 1031-1032. Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. **Menard v. Lafayette Insurance Company**, 2009-1869 (La. 3/16/10), 31 So.3d 996, 1006. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expense will be medically necessary. *Id.* An award of future medical expenses is justified if there is medical testimony that they are indicated and that sets out their probable cost. **Hanks v. Seale**, 2004-1485 (La. 6/17/05), 904 So.2d 662, 672. See also **Menard**, 31 So.3d at 1006. However, an award for future medical expenses is, in great measure, highly speculative, not susceptible to calculation with mathematical certainty, and generally turns on questions of credibility and inferences. *Id.* A jury's decision regarding special damages is subject to the manifest error standard of review, which only allows an appellate court to reverse or adjust a special damage award where: (1) there is not reasonable factual basis for the jury's decision, and (2) the decision is clearly wrong. See **Guillory**, 692 So.2d at 1032.

Herein, the defendants challenge the award of future medical expenses, arguing that the jury's award of $285,000.00 was based on nothing more than conjecture by Mr. Hicks's counsel and that no evidence was presented establishing that it was more probable than not that Mr. Hicks would need future cervical and lumbar spine surgery.

Both Dr. Isaza and Dr. Turnipseed testified as to Mr. Hicks's need for future medical treatment and that Mr. Hicks's neck and back pain would be chronic and lifelong. Specifically, with regard to Mr. Hicks's neck issues, Dr. Isaza and Dr.

22

Turnipseed were conservatively treating the cervical disc herniations, and Dr. Turnipseed was managing Mr. Hicks's cervical pain with epidural steroid injections (ESIs). However, Dr. Isaza testified that the relief from the ESIs would not last forever and that Mr. Hicks would eventually need a two-level cervical decompression and fusion. Dr. Isaza described the eventual recommended surgical procedure and gave a cost estimate of $137,000.00 to $140,000.00 for same.

The defendants' expert, Dr. Harrod, agreed with Dr. Isaza and Dr. Gary Lum, Mr. Hicks's expert in the field of neuroradiology, that Mr. Hicks's cervical disc herniations looked like soft disc herniations, indicating a more recent injury. Dr. Harrod also believed that the cervical surgery recommendation was appropriate. Dan Cliffe, the defendant's economic evaluation expert, gave a cost estimate of $136,212.44 to $141,640.44, if cervical surgery was necessary.

As to Mr. Hicks's lumbar issues, contrary to Dr. Smith, Dr. Isaza believed that Mr. Hicks's disc herniations at the L5-S1 level were soft herniations, finding them to be of a more recent nature, indicating that they were the result of trauma. Dr. Turnipseed tried ESIs, radio frequency ablation procedures (RFAs), and dorsal medial branch blocks on Mr. Hicks to alleviate his chronic back pain. Dr. Turnipseed testified that he had "tried just about everything" for Mr. Hicks and that he was "at the end of the line" as far as Mr. Hicks's lower back was concerned. In November 2017, Dr. Isaza ordered another MRI of Mr. Hicks's lumbar spine as he was considering recommending lumber surgery to Mr. Hicks.[22] However, after further testing and not long before trial, Dr. Isaza and Dr. Turnipseed both concluded that the majority of Mr. Hicks's pain was emanating from the L5-S1 level in his lower back. Dr. Isaza testified that he discussed the available options with Mr. Hicks, and lower back surgery was scheduled for June

_____

[22] At one point, Dr. Isaza believed that the primary pain generator was Mr. Hicks's sacroiliac joint.

18, 2018, shortly after trial. Dr. Isaza described the lumbar surgery, estimating the cost to be between $99,000.00 and $100,000.00. Even with the surgery, Dr. Isaza and Dr. Turnipseed both believed that Mr. Hicks would probably develop adjacent disc disease, which would require future medical treatment.

Because Mr. Hicks did not have a history of treatment, Dr. Isaza concluded that it was more probable than not that the accident at issue caused Mr. Hicks's neck, back, and arm pain and that all of Mr. Hicks's treatment was related to those injuries. Additionally, Dr. Turnipseed was of the opinion that it was more likely than not that Mr. Hicks's neck and back problems were caused by the accident.

However, Dr. Harrod did not agree that a lumbar fusion was necessary or appropriate for Mr. Hicks and instead recommended continued conservative treatment with ESIs. Dr. Harrod was also of the opinion that Mr. Hicks's back problems were degenerative. Although Dr. Harrod recognized that back surgery was possible in the future for Mr. Hicks, he could not relate Mr. Hicks's current symptoms to the motor vehicle accident. Additionally, Dr. Smith, Mr. Hicks's workers' compensation physician, did not believe that Mr. Hicks was a candidate for lumbar surgery. Dr. Smith testified that Mr. Hicks's cervical and lumbar issues were degenerative in nature and pre-existed the accident. Nonetheless, Mr. Cliffe, the defendants' economist, gave a present value for lumbar surgery, if needed, between $99,640.00 and $100,718.00.

Mr. Hicks's economist, Dr. Rice, calculated total future medical expenses based on Mr. Hicks's life expectancy. One track was based on continued cervical ESI's in lieu of neck surgery, and Dr. Rice calculated a range of $231,148.00 to $294,526.00 in total future medical care. The second track was based on cervical surgery, and Dr. Rice calculated a total of $292,293.00 to $325,564.00 in future medical expenses.

24

In contrast, Dr. Larry Stokes, the defendants' rehabilitation counselor and life care planner, estimated no future medical costs. Dr. Stokes relied on the medical testimony of the defendants' experts that lumbar surgery was neither necessary nor related to the accident. Additionally, because Dr. Harrod's opinion was only that Mr. Hicks might need cervical surgery in the future, Dr. Stokes gave a zero cost estimate for neck surgery.

After reviewing the entire record herein, the medical evidence reasonably supports a factual finding that the October 1, 2015 accident caused Mr. Hicks's cervical and lumbar injuries, as well as injuries to his wrist and elbow. Additionally, the evidence reasonably supports the conclusion that it is more probable than not that Mr. Hicks will require future medical treatment for his neck and back, including both cervical and lumbar surgeries, and that the probable cost of Mr. Hick's future medical care ranges from $231,148.00 to $325,564.00. As such, we find no manifest error in the jury's award of $285,000.00 to Mr. Hicks for his future medical expenses.

## 2. Loss of Earning Capacity/Future Lost Earnings

Damages for a loss of earning capacity should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss. **Hobgood v. Aucoin,** 574 So.2d 344, 346 (La. 1990). Damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. **Hobgood,** 574 So.2d at 346.

Because awards for loss of earning capacity are inherently speculative and are intrinsically incapable of being calculated with mathematical certainty, the trier

25

of fact is given much discretion in fixing such an award. **Jenkins v. State ex rel. Dept. of Transp. and Development**, 2006-1804 (La. App. 1st Cir. 8/19/08), 993 So.2d 749, 772-73, writ denied, 2008-2471 (La. 12/19/08), 996 So.2d 1133. Nevertheless, a projection of loss of future earning capacity must have a factual basis in the record, and an award may not be based upon speculation, possibility, or conjecture. **Jenkins**, 993 So.2d at 775.

The defendants assert that the jury's award of $156,000.00 for loss of earning capacity is not supported by the record. They argue that because Mr. Hicks's worked full time after the accident and suffered no depreciable loss of earning capacity, this award should be reduced to zero.

Mr. Hicks testified that until the accident he was in good health. He stated that he always worked, doing odd jobs, including concrete work, until he began working for Rockforte Farms, earning $10 per hour as a farm laborer.[23] Mr. Hicks testified that before the accident, he could do whatever was asked of him by Mr. Rockforte, which included repairing farm equipment and driving the tractors for the farm. Mr. Hicks testified, however, that after the accident, he tried to work, but had difficulty bending over and lifting anything, and therefore, he only worked sporadically in 2016 and 2017.

Ms. Chalfin, Mr. Hicks's vocational rehabilitation expert and life care planner, testified that she spoke with Mr. Rockforte, who stated that before the accident, Mr. Hicks was a very hard worker, very dependable, and "gave over one hundred percent." Mr. Rockforte also told Ms. Chalfin that after the accident, he noticed a change as Mr. Hicks worked intermittently, with no consistency, and that Mr. Hicks would do some tractor work, pick up equipment parts, or drive other employees around the farm.

---

[23] One of Mr. Hicks's previous jobs was as a concrete finisher in Indianapolis, earning between $23.00 and $27.00 per hour.

Ms. Chalfin further testified that, based on her testing, review of employment records, and communications with Mr. Hicks's treating physicians, she believed that Mr. Hicks could not return to his past occupations and that finding work for him would be difficult. She noted that Mr. Hicks was fifty-four years old at the time of the trial, that he had significant vocational and academic deficits, and that his prospects for employment were guarded. Ms. Chalfin stated that in order for Mr. Hicks to work, he would need a very understanding employer willing to make accommodations.[24]

At the time of the trial, Mr. Hicks statistically had a 7.64 year work-life expectancy. Dr. Rice calculated an award of $156,066.00 for the loss of future earning potential based on the inability of Mr. Hicks to return to full time employment. Dr. Rice also calculated an award of $346,286.00 based on Mr. Hicks's ability to return to work as a concrete finisher.

In opposition to this evidence, the defendants presented the testimony of their expert rehabilitation counselor, Dr. Stokes. Although Dr. Stokes agreed with much of Ms. Chalfin's testimony and believed that Mr. Hicks's employment outlook was not "great," he was of the opinion that Mr. Hicks could find full-time light duty employment. Accordingly, Dan Cliffe, the defendants' economic evaluation expert, calculated no future wage loss for Mr. Hicks, based on an $18,000.00 annual wage.

Considering the testimony and medical evidence, as well as Mr. Hicks's physical and academic limitations, we find the record reasonably supports the jury's implicit conclusion that Mr. Hicks was unable to return to full-time employment as a result of the October 1, 2015 accident and that it was more likely than not that Mr. Hicks would have returned to his employment full time with

---

[24] We note that Dr. Turnipseed restricted Mr. Hicks to light work duties, precluding him from returning to work as a farm laborer or concrete finisher.

Rockforte Farms. Accordingly, the jury's award of $156,066.00 for Mr. Hick's loss of earning capacity was reasonable and not an abuse of the jury's discretion.

3. General Damages

Vast discretion is accorded the trier of fact in fixing general damage awards. **Duncan**, 773So.2d at 682. This vast discretion is such that an appellate court should rarely disturb an award of general damages. *Id.*, citing **Youn v. Maritime Overseas Corp.**, 623 So.2d 1257, 1261 (La. 1993). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. **Duncan**, 773 So.2d at 682; **Youn**, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. **Youn**, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. *Id.* Thus, the initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. **Cone v. National Emergency Services Inc.**, 99-0934 (La. 10/29/99), 747 So.2d 1085, 1089. Only after a determination that the trier of fact has abused its "much discretion" is resort to prior awards appropriate, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within that discretion. **Coco v. Winston Industries, Inc.**, 341 So.2d 332, 335 (La. 1976).

The defendants maintain that the general damages awarded by the jury, totaling $711,000.00, are excessive. As previously set forth above, the jury awarded $300,000.00 for past and future pain and suffering, $300,000.00 for past and future mental anguish, $55,000.00 for past and future loss of enjoyment of life, and $55,000.00 for disability.

28

Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. **McGee**, 933 So.2d at 775. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. **Jenkins**, 993 So.2d at 767. In comparison, loss of enjoyment of life refers to detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life he enjoyed prior to the injury. **McGee**, 933 So.2d at 775; **Kelley v. Gen. Ins. Co. of Am.**, 2014-0180(La. App. 1st Cir. 12/23/14), 168 So.3d 258, 545, writs denied, 2015-0157, 2015-0165 (La. 4/10/15), 163 So.3d 814 and 815. Additionally, for purposes of a general tort claim, disability damages are recognized as those general damages constituting any permanent disability or impairment that is secondary to the injuries sustained in the accident. **Cotton v. State Farm Mut. Auto. Ins. Co.**, 2010-1609 (La. App. 1st Cir. 5/6/11), 65 So.3d 213, 222, writ denied, 2011-1084 (La. 9/2/11), 68 So.3d 522. Disability is defined as "the inability to perform some function," or alternatively, "[a]n objectively measurable condition of impairment, physical or mental." Impairment is simply defined as "[t]he quality, state, or condition of being damaged, weakened or diminished." Bryan A. Garner, Black's Law Dictionary (11th ed. 2019); **Willis v. Noble Drilling (US), Inc.**, 2011-598 (La. App. 5th Cir. 11/13/12), 105 So.3d 828, 845. See also **Boudwin v. General Ins. Co. of America**, 2011-0270 (La. App. 1st Cir. 9/14/11) (*unpublished*), 2011 WL 4433578, at *2.

In this matter, Mr. Hicks testified that he did not immediately go to the hospital after the accident, but because his pain worsened that night, he went to his family clinic in Maringouin the following morning, complaining of a headache and lower back and neck pain, as well as pain under his right shoulder. As a result of his evaluation, Mr. Hicks was prescribed pain medication for lumbar and cervical strain. Because his symptoms did not resolve, Mr. Hicks then went to a

chiropractor for twenty-one sessions.[25] Still without relief, Mr. Hicks underwent cervical and lumbar MRIs on December 16, 2015, by Dr. Gary Lum, the neuro-radiologist. Dr. Lum was of the opinion that Mr. Hicks suffered from cervical and lumbar spine herniations. At trial, Dr. Lum pointed out the herniations to the jury using the MRI films and explaining that the films indicated that the injuries manifested recently and that he believed that they were related to the collision.

After the MRIs were performed, Mr. Hicks was referred to Dr. Turnipseed and Dr. Isaza. Thereafter, Mr. Hicks underwent twenty-eight injection procedures performed by Dr. Turnipseed for pain, including cervical and lumbar ESIs, lumbar RFAs, and cervical and lumbar median branch block procedures. The procedures were described by Dr. Turnipseed as being very painful.

Dr. Isaza and Dr. Turnipseed were both of the opinion that Mr. Hicks's neck and back pain would be chronic and lifelong. Dr. Turnipseed specifically testified that Mr. Hicks "will suffer from chronic pain indefinitely." Dr. Isaza testified that his goal for Mr. Hicks was to go from miserable to tolerable. Dr. Turnipseed believed that surgery was the only remaining alternative for Mr. Hicks as far as his back was concerned, but even with lumbar surgery, both Dr. Isaza and Dr. Turnipseed expected future adjacent disc problems. The doctors also believed that the cervical ESIs for Mr. Hicks's could continue until they no longer helped him, at which point surgery would be necessary. Dr. Isaza related the neck, back, and arm injuries to the accident. Dr. Turnipseed also believed that it was more likely than not that Mr. Hicks's neck and back pain was caused by the collision.

Also, as previously noted, Dr. Timothy Bowlin, an orthopedic surgeon, performed two outpatient surgeries for cubital tunnel syndrome and carpel tunnel

---

[25] Mr. Hicks testified that the chiropractor he used was the same one he went to when he was rear-ended in a motor vehicle accident in 1990. He testified that he went to the chiropractor for back pain as a result of the earlier accident and the pain resolved. He further stated that he has had no problems with his back for twenty-five years until the accident on October 1, 2015.

syndrome. These surgeries were performed on the same date with local anesthesia. Dr. Bowlin believed that the damaged nerves in Mr. Hicks's left wrist and elbow were directly related to the accident at issue herein and that it was more likely than not that the arm and neck injuries were caused by the accident.

At trial, Mr. Hicks testified that after the accident he could not keep working because of the pain in his back and neck. He stated that bending over to work on farm equipment was too difficult and that he could no longer drive the tractor as it bounced him around and was too painful. Mr. Hicks also stated that he could no longer put on his socks and shoes because of the pain. Mr. Hicks testified that besides the chronic pain, he suffers from depression, anxiety, and sleeplessness. Mr. Hicks also complained of so much pain that it had gotten to the point that he "can't take it anymore" and just wanted the pain cut out.

In reviewing a general damage award, an appellate court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion. **Smith v. Goetzman**, 97-0968 (La. App. 1st Cir. 9/25/98), 720 So.2d 39, 48. Based on our review of the record, it is evident that Mr. Hicks has suffered and will continue to suffer pain and suffering, mental anguish, and loss of enjoyment of life, as well as suffer from his disability, all of which are resulting from injuries that he sustained in the October 1, 2015 accident. Considering the severity of Mr. Hicks's injuries and their effect on his life, including the two outpatient surgeries for severe carpel tunnel syndrome and severe cubital tunnel syndrome that Mr. Hicks has already undergone and the cervical and lumbar surgeries that Mr. Hicks will undergo at some time in the future, we cannot say that the jury abused its discretion in awarding Mr. Hicks general damages totaling $711,000.00 to compensate Mr. Hicks for his injuries.

**CONCLUSION**

For the foregoing reasons, the May 25, 2018 and August 9, 2018 judgments of the trial court are affirmed. All costs of this appeal are assessed to the defendants, Robert L. Harger, Jr. and USAA General Indemnity Company.

**AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 0552

RONALD HICKS

VERSUS

USAA GENERAL INDEMNITY COMPANY, ROBERT L. HARGER, JR., R.L.
HARGER AND ASSOCIATES, INC. AND HARGER AND COMPANY, INC.

*PMc by JCU* *************************************************

**McClendon, J., dissenting.**

I disagree with the finding that there was no legal error by the trial court in denying the defendants' request for an additional medical examination (AME) based on a lack of "good cause" under LSA-C.C.P. art. 1464. While I recognize that there are no definitive guidelines as to what constitutes good cause, the notion of fair play, which is woven into the fabric of our system of justice, must be considered.[1]

When the defendants filed their motion to compel a medical examination by Dr. Harrod, the only medical opinions rendered regarding Mr. Hicks's lumbar spine issues were from his treating physicians, none of whom had been retained by the defendants to examine Mr. Hicks. Further, Dr. Smith, the orthopedist who had initially seen Mr. Hicks and who stated he did not believe that surgery was necessary, had not seen the patient for more than a year prior to trial. Although Mr. Hicks argued that the defendants had access to the opinion of Dr. Smith, Dr. Smith had no opportunity to examine and evaluate Mr. Hicks subsequent to Dr. Isaza's lumbar surgery recommendation. Further, due to patient privacy issues, the defendants were not allowed to consult with Dr. Smith. Therefore, it does not appear that there was any other method by which the defendants could obtain timely medical information.

---

[1] I point out Justice Crichton's recent dissent in the denial of the writ application in **Haider v. Morris**, 19-01477 (La. 11/12/19), 282 So.3d 209, wherein he stated:

> I would grant and docket this matter to examine the significant and unresolved legal standard for "good cause" sufficient for a court to order an additional medical examination pursuant to La. C.C.P. art. 1464(A). ... I believe that if this Court does not provide appropriate guidelines for the legal analysis of "good cause" under La. C.C.P. art. 1464(A), deference to the district court in determinations thereof is unwarranted.

1

Further, because of the denial of the motion to compel an AME, the only recent medical examination of Mr. Hicks within the year before trial was that by Dr. Isaza, Mr. Hicks's chosen orthopedist. Further, Dr. Isaza recommended surgery only two weeks before trial. As a result, the defendants were denied the opportunity to challenge and rebut the opinion of Dr. Isaza with an examination and opinion of an expert of their own choosing or even with a recent opinion by Dr. Smith, who was selected by the workers' compensation carrier.

I find this particularly troubling in light of the fact that in closing arguments, Mr. Hicks's counsel used the pretrial ruling prohibiting the AME to undermine the credibility of Dr. Harrod's medical opinion.[2] Given the particular facts and circumstances of this case, I believe that the trial court abused its discretion in determining that good cause did not exist for an AME. At a minimum, the cornerstone principle of fundamental fairness required that the defendants be given the opportunity to present evidence to challenge, or even confirm, the surgical recommendation of plaintiff's expert.

Moreover, I am of the opinion that the trial court's ruling denying the AME was far from harmless. Although Dr. Harrod was allowed to review the medical records and give an opinion based on the records review, Mr. Hicks's counsel, in his closing arguments, directly attacked the credibility and reliability of Dr. Harrod's medical opinion based on the fact that Dr. Harrod did not examine Mr. Hicks. Clearly, the credibility of Dr. Harrod was at issue during the jury deliberations as evidenced by the jury's question to the trial court as to whether Dr. Harrod was allowed to examine Mr. Hicks.[3]

A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. **Evans v. Lungrin**, 97-0541 (La. 2/6/98), 708 So.2d 731, 735.

---

[2] At the hearing on the motion to compel, counsel for the defendants warned the trial court that counsel for Mr. Hicks would use the denial of an AME against them, stating "I guarantee you that my friend here, at trial, is going to argue that [Dr. Harrod] didn't even see [Mr. Hicks], ... Jury, how can he make an opinion, he didn't even look at him." Thereafter, during closing arguments, counsel for Mr. Hicks did, in fact, argue to the jury that "**[Dr. Harrod] never saw the patient. He said multiple times in order to make a decision, to make an opinion, he'd have to see him, and he didn't see him.**" Counsel further argued that **Dr. Harrod "cannot be believed, he's just not credible. He's not seen this patient."** (Emphasis added).

[3] The jurors clearly rejected the opinions of Dr. Harrod and Dr. Smith that Mr. Hicks did not need lumbar surgery and, instead, chose to accept Dr. Isaza's opinion based on the $285,000.00 amount awarded for future medical expenses.

2

A review of the entire record leaves little doubt that the ruling of the trial court, which prevented Dr. Harrod from examining Mr. Hicks, materially affected the outcome of this case and constituted legal error. As such, I would vacate and remand for a new trial. Therefore, I respectfully dissent.

3

RONALD HICKS

VERSUS

USAA GENERAL INDEMNITY
COMPANY, ROBERT L. HARGER,
JR., R.L. HARGER AND
ASSOCIATES, INC. AND HARGER
AND COMPANY, INC.

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 0552

HOLDRIDGE, J., dissenting.

I agree in part with the dissent of Judge McClendon. Clearly, the trial court was in error in denying the defendants' request for an additional medical examination and the closing arguments of the plaintiff's counsel were improper. Further, I find that the trial court abused its discretion in failing to answer the written question of the jurors of "Was Dr. Harrod allowed to see him?" The correct response would have been for the trial court to advise the jury that Dr. Harrod did not see the plaintiff because of a ruling by the court. A factual answer to the jurors' question would have enabled the jury to collectively reach a result by applying all of the factors presented to it. An answer to the jurors' question would have precluded any question being raised as to the validity of the jury verdict.

However, I disagree with Judge McClendon's dissent requiring a remand for a new trial. I would find that this court should conduct a *de novo* review of the evidence presented at trial. In this case, there was overwhelming evidence that the plaintiff was injured, the jurors believed the plaintiff's testimony, and there was sufficient medical testimony to substantiate a substantial award to the plaintiff. This court, after a *de novo* review, could determine if an alteration of the jury's monetary award was required.